Jerome McCLOSKEY, Patrick Hayes and Michael P. Borg, on behalf of themselves and all other employees similarly situated, Plaintiffs,

v.

TRIBOROUGH BRIDGE and Tunnel Authority, Defendant.

No. 93 Civ. 8685 (DC).

United States District Court, S.D. New York.

Oct. 26, 1995.

Joan Stern Kiok, New York City, for plaintiffs.

Proskauer Rose Goetz & Mendelsohn, LLP by Allen I. Fagin, Fredric C. Leffler, Xavier Romeu, New York City, for defendant.

## *OPINION*

CHIN, District Judge.

In this case, 21 managerial employees of defendant Triborough Bridge and Tunnel Authority (the "TBTA") seek to recover unpaid overtime compensation under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq.*, for the period from December 3, 1990 to December 3, 1993.[1] The issue presented is whether plaintiffs are "bona fide executive, administrative or professional" employees who are "exempt" from overtime coverage under the FLSA.

Plaintiffs have stipulated that their duties and responsibilities would place them in the category of bona fide executive, administrative or professional employees. They contend, however, that they are not exempt from the overtime provisions of the FLSA because they were not paid on a "salary basis" within the meaning of regulations promulgated by the United States Department of Labor (the "DOL"). In essence, plaintiffs contend that they are "hourly" rather than "salaried" em-

1. Plaintiffs have not identified what they believe to be the relevant period. Thus, I accept the TBTA's statement that these dates define the relevant period.

ployees because the TBTA has retained the right to reduce their compensation "because of variations in the quality or quantity" of their work.

In contrast, the TBTA argues that the "salary basis" test should not be applied to public sector employees. Noting that the test was established by the DOL some 20 years before the FLSA was extended to cover public employees, and noting further that principles of public accountability make it impossible for public employers to meet the salary basis test, the TBTA argues that the DOL regulations conflict with Congress's intent to exempt "bona fide executive, administrative and professional" *public* employees from coverage under the FLSA.

Before me are the parties' cross-motions for summary judgment. Although I conclude that the part-day docking provision and the temporary military leave, jury duty, or attendance as a witness provision of the salary basis test must be stricken as violative of congressional intent, the remaining provisions of the salary basis test, including the disciplinary penalties provision, are valid. A genuine issue of material fact exists, however, as to whether plaintiffs were subject to reduction in salary for violating rules other than safety rules of major significance. Accordingly, both motions for summary judgment are denied.

## FACTUAL BACKGROUND

### A. The Parties

Plaintiffs are a group of non-union employees of the TBTA who held various managerial positions, such as Bridge and Tunnel Supervisor, General Manager, and Maintenance Superintendent, during the relevant time period. The parties have stipulated that plaintiffs' job duties were those of executive, administrative, or professional employees. Each plaintiff received an annual salary between $60,000 and $84,000 per year and was classified as exempt from overtime coverage under the FLSA by the TBTA.

2. All references to "Pl.App." refer to Appendix "A" in Support of Plaintiffs' Motion for Partial

The TBTA is a public benefit corporation created pursuant to section 552 of the New York Public Authorities Law. The TBTA has the authority "to appoint officers, agents and employees and fix their compensation"; however, this authority is subject to the provisions of the New York Civil Service Law. N.Y.Pub.Auth.Law § 553(7) (McKinney 1994). Thus, the TBTA's employees are civil service employees who are subject to the New York Civil Service Law. *Id.*

### B. TBTA Policies and Procedures

The TBTA established time and leave regulations and other policies for its employees concerning, *inter alia*, absences from work, temporary military leave, and service as a witness in court proceedings. (Pl.App.Exh. A, C).[2] For example, the TBTA could charge the sick and vacation leave banks of its employees for absences of less than one day. (*Id.* at Exh. L). Also, the TBTA could dock its employees for military leave that extended more than twenty-two work days. (*Id.* at Exh. A). Finally, the TBTA could dock its employees who missed work as a result of a court appearance when the employee had a personal interest in the proceeding. (*Id.*).

As explored more fully below, of greater significance are the TBTA's disciplinary policies. Included in the TBTA Employee Handbook, the Managerial Time and Leave System, and other policy memoranda were various policies and procedures applicable to TBTA employees. Most of these provisions included disciplinary penalties that were imposed for failure to follow such policies and procedures. Examples of the various policies, rules, and regulations include the following:

- The TBTA's work day began at 9:00 a.m. Employees were given a fifteen minute grace period to arrive at work; non-excused lateness of sixteen minutes or more was charged in half-hour increments to the employee's annual leave. (Pl.App.Exh. A at 12).

Summary Judgment.

- TBTA employees were required to provide documentation explaining absences due to illness. Failure to provide required documentation resulted in such absences being charged as unauthorized and without pay. Also, the employee was subject to disciplinary action. (*Id.* at 4).
- When missing work due to a death in the family, TBTA employees could be required to provide documentation, such as a copy of the death certificate. Failure to provide documentation upon request resulted in such leave being charged to annual leave credits or without pay. (*Id.* at 6).

TBTA employees were also subject to a host of other disciplinary penalties, such as misuse of a department computer or photocopying machine (Williams Dep. at 116), misuse of an official vehicle (*id.*), misuse of a telephone for personal use (*id.*), misuse of a TBTA badge or pass (*id.* at 138; Pl.App.Exh C. at 12), attempting to gain free passage on MTA operated mass transit facilities (Pl.App. Exh. P), and improper or unauthorized transmission via use of two-way radios (*Id.* at Exh. S). Plaintiffs contend that these various policies violated the provisions of the salary basis test, thereby entitling them to overtime compensation under the FLSA.

### HISTORICAL BACKGROUND

To understand both parties' arguments, a discussion of the history of the FLSA and the DOL's regulations is necessary. In 1938 Congress enacted the FLSA "to promote economic justice and security for the lowest paid of our wage earners, to create conditions of employment stability, and to eliminate unfair competitive labor practices in industry." S.Rep. No. 640, 81st Cong., 1st Sess. (1949), *reprinted in* 1949 U.S.C.C.A.N. p. 2241; *see also Barrentine v. Arkansas– Best Freight Sys., Inc.,* 450 U.S. 728, 739, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981) (Congress enacted the FLSA to protect all covered workers from substandard wages and oppressive working hours and labor conditions). Under the FLSA, employers were required to pay a minimum wage plus overtime at one and one-half times the employ-

ee's regular wage for hours worked in excess of forty per week. 29 U.S.C. § 207(a)(1). Congress created an exemption to this rule, however, for "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1) (the "white-collar exemption"). Congress did not define the term "bona fide executive administrative, or professional employee," leaving that responsibility to the DOL.

In 1940, the DOL first enacted regulations and interpretations defining the parameters of the white-collar exemption. *See* 5 Fed. Reg. 4077 (1940). After holding hearings on the subject, the DOL amended the regulations and interpretations in 1954. The amended regulations provided for a "duties test" and a "salary basis test" that were to be applied in determining which employees qualified for exempt status. 29 C.F.R. §§ 541.1, 541.2, 541.3, 541.118.

As originally written, and as it still reads, the salary basis test provides that an employee is exempt from the FLSA overtime pay requirements only if he is paid on a salary (as opposed to an hourly) basis, that is "if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount consisting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed." 29 C.F.R. § 541.118(a).

With certain exceptions, a "salaried" employee "must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked." *Id.* One important exception, however, is that a "salaried" employee does not lose his exempt status if he is subject to deductions for absences of "a day or more for personal reasons, other than sickness or accident." 29 C.F.R. § 541.118(a)(2). In contrast, an employee does lose his exempt status (and therefore must be paid overtime) when his salary is subject to reductions for, *inter alia,* partial-day absences for personal reasons, including lateness, sickness, or disability, absences for jury duty, attendance as a witness, or temporary military leave, or

disciplinary reasons other than penalties imposed in good faith for infractions of safety rules of major significance. 29 C.F.R. § 541.118(a)(2–5).

When first created, neither the FLSA nor the DOL's regulations and interpretations applied to public employees. In 1966, Congress extended the minimum wage and overtime provisions of the FLSA to employees of public hospitals, schools, and certain mass transit carriers. The Supreme Court held that this extension was constitutional in *Maryland v. Wirtz*, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). In 1974, Congress extended FLSA coverage to all public employees, stating that under this bill, coverage was extended to *"non-supervisory* employees in the public sector." 1974 U.S.C.C.A.N. 2811, 2837. The Supreme Court struck down this extension, however, holding that the Tenth Amendment barred application of the FLSA to the "traditional governmental functions" of state and local governments. *National League of Cities v. Usery*, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976).

In 1985, the Supreme Court reversed paths again, holding that the Tenth Amendment did not bar application of the FLSA to all public employees. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). In response to this decision, Congress amended the FLSA to provide a temporary adjustment period for public employers. Pub.L. No. 99–150, 1985 U.S.C.C.A.N. (99 Stat.) 787. Although Congress was silent as to the applicability of the salary basis test to public employers, it did note that it sought to protect the "particular needs and circumstances of the states." 1985 U.S.C.C.A.N. 651, 655.

Application of the salary basis test to public employers immediately caused concern, as principles of public accountability prevented these employers from paying their employees for time not worked. 57 Fed.Reg. 37666, 37667. Thus, public employers were unable to satisfy the requirements of the salary basis test. To ameliorate these concerns, in 1987 the DOL instituted a nonenforcement policy with respect to the salary basis test as applied to public employers while the DOL considered amending the regulation. 57 Fed.Reg. 37666, 37668. The DOL stated, however, that this nonenforcement policy would not impede the right of public employees to file private lawsuits. *Id.*

The DOL did not follow-up on its promise to amend the salary basis test with respect to public employers until September of 1991. At that time, the DOL issued an interim rule stating that otherwise exempt public employees who were paid according to a pay system requiring reductions for partial-day absences would not lose exempt status due to that pay system. 57 Fed.Reg. 37666, 37670. In August of 1992, the DOL promulgated a final rule that amended the salary basis test for public employers. 29 C.F.R. § 541.5d. In essence, the amendment eliminated the application of the part-day docking rule to public employers. The amendment provided that the white collar exemption would not be lost for public employees who were subject to a pay system "established by statute, ordinance, or regulation, or by a policy or practice established pursuant to principles of public accountability." *Id.* The DOL chose not to amend any other aspect of the salary basis test.

### DISCUSSION

The TBTA claims that the salary basis test is invalid as applied to public sector employers because it is contrary to the FLSA and congressional intent. It argues that, although Congress intended the white collar exemption to apply to public employers, public employers cannot satisfy the salary basis test because it conflicts with principles of public accountability. Thus, according to the TBTA, the salary basis test is arbitrary and capricious and should be void as applied to public employers.

The Second Circuit has not addressed this issue.[3] Furthermore, although some courts

---

3. In *Whitmore v. Port Auth. of New York and New Jersey,* 907 F.2d 20 (2d Cir.1990), the Second Circuit briefly discussed the salary basis test in a case involving a public employer. In *Yourman v.*

*Dinkins,* 826 F.Supp. 736 (S.D.N.Y.1993), Judge Preska interpreted various provisions of the salary basis test as applied to a public employer. In neither case, however, was the issue of the *appli-*

have addressed the applicability of the salary basis test to public employers with respect to part-day docking and disciplinary penalties,[4] no court has addressed the question with respect to temporary military leave, jury duty, and witness service.

## A. Validity of the Salary Basis Test

■ The standard for reviewing an agency's construction of a statute was established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron,* the Supreme Court held that if the intent of Congress is clear, then both the court and the agency must give effect to this intent. *Id.* at 842–43, 104 S.Ct. at 2781–82. Thus, a court must reject an administrative construction that is contrary to clear congressional intent. *Id.* at 843 n. 9, 104 S.Ct. at 2778 n. 9. If Congress has not directly addressed the precise question at issue, however, the court must determine whether the agency's regulation "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

■ Furthermore, an important distinction exists between regulations and interpretations. Regulations are promulgated in response to a congressional grant of authority and thus are entitled to greater weight and carry the full force of law. *See Reich v. State of New York,* 3 F.3d 581, 587 (2d Cir.1993) (if reasonable, Secretary's regulations must be accorded force of law). Conversely, interpretations are simply statements that clarify the statutory language, and hence they do not carry the force of law but are entitled to a certain amount of deference depending on their persuasiveness. *Id.;*

*see also Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) ("Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position and the nature of its expertise.").

Here, there are two issues concerning congressional intent that must be addressed: (1) whether Congress clearly intended that the white-collar exemption apply to public employers and (2) whether Congress clearly intended that the salary basis test apply to public employers.

■ There is little dispute regarding the first issue. In extending the FLSA to the public sector, Congress clearly intended that public sector employers could claim the white-collar exemption for its managerial and administrative personnel. Evidence of this intent is contained in the legislative history of the 1974 amendment to the FLSA. Discussing the bill that extended the FLSA to the public sector, Congress stated that "the bill extends minimum wage and overtime coverage to about 5 million *non-supervisory* employees in the public sector." H.R.Rep. No. 913, 93rd Cong., 2d Sess. (1974), *reprinted in,* 1974 U.S.C.C.A.N. pp. 2811, 2837 (emphasis added); *see also Service Employees Int'l Union, Local 102 v. County of San Diego,* 60 F.3d 1346, 1351 (9th Cir.1995) ("*SEIU*"). Thus, Congress specifically recognized that overtime coverage would not be extended to supervisory employees, presumably because the white-collar exemption excluded such employees from this provision of the FLSA. Also, in legislative history to the 1985 amendment to the FLSA, Congress stated that it intended to protect the "partic-

---

cability of the salary basis test to public employers before the court. Similarly, in *Reich v. State of New York,* 3 F.3d 581 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994), the court addressed the white-collar exemption's applicability to public employers, but did not discuss the salary basis test. In *Feaser v. City of New York,* No. 95 Civ. 5739, 1994 WL 681631 (S.D.N.Y. Dec. 5, 1994), Judge Preska held that her rulings in *Yourman* had collateral estoppel effect on the defendant, as "it would be premature to hold at this juncture that the salary basis test is inapplicable to public employers." *Id.* at *2. It does not appear, however, that the issue of the salary basis test's

applicability to public employers was squarely before the court.

4. *See, e.g., Service Employees Int'l Union, Local 102 v. County of San Diego,* 60 F.3d 1346 (9th Cir.1995) (holding that the entire salary basis test is invalid as applied to public sector employers because the part-day docking provision is contrary to congressional intent); *Mueller v. Reich,* 54 F.3d 438 (7th Cir.1995) (holding that after the 1992 amendment that eliminated the part-day docking rule for public employers, the salary basis test is valid).

ular needs and circumstances of the states." 1985 U.S.C.A.A.N. 651, 655. Again, this statement evidences Congress's intent to extend exemptions to the FLSA, as well as the other provisions, to public employers.

Similarly, the DOL's statements concerning the 1992 amendment to the salary basis test acknowledge Congress's intent that the white-collar exemption apply to the public sector. In reviewing congressional intent, the DOL found that "it is clear from a plain reading of the FLSA's legislative history in 1974 that Congress intended that the section 13(a)(1) exemption be available for public sector employees." 57 Fed.Reg. 37672 (1992). Thus, there can be no doubt that Congress extended the white-collar exemption to public employers.

As to the second issue, when it extended the FLSA to the public sector, Congress did not express a view as to whether the salary basis test should apply to the public sector. Furthermore, the salary basis test is not an authoritative regulation, but simply an interpretation. 29 C.F.R. Pt. 541, subpt. B. Thus, I must determine if the various provisions of the salary basis test assist in applying the FLSA and whether those provisions give effect to Congress's intent that the white-collar exemption apply to public sector employers. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2778; *Reich,* 3 F.3d at 587.

### 1. *Part-day Docking*

Before September 6, 1991, the salary basis test provided that employers would lose the white-collar exemption if they deducted from an exempt employee's salary for an absence of less than a day.[5] 29 C.F.R. § 541.118(a)(2–3). Based on principles of public accountability, however, public employers in New York could not pay their employees for time not actually spent working. *Cf. Brooklyn Soc'y for the Prevention of Cruelty to Children v. Blum,* 56 N.Y.2d 909, 453 N.Y.S.2d 408, 410, 438 N.E.2d 1123, 1125 (1982) (it is proper to distinguish between private and public agencies because "expen-

ditures by public agencies are subject to a significantly greater public accountability and examination (calculated to assure restraint) than are the comparable fiscal operations of private agencies."). Thus, there existed an irreconcilable clash between Congress's intent to extend the white collar exemption to public employers and a public employer's obligations based on principles of public accountability. Application of the part-day docking rule prevented public employers from satisfying the salary basis test and thus prevented them from qualifying for the white-collar exemption. This result conflicts with congressional intent.

The conclusion that the part-day docking rule conflicts with congressional intent finds support in statements by the DOL. The DOL itself concluded that the part-day docking provision as applied to public sector employers was contrary to the intent of Congress:

> [I]t is clear from a plain reading of FLSA's legislative history in 1974 ... that Congress intended for the section 13(a)(1) exemption to be available for public sector employees. Congress presumably was unaware that, because many public sector compensation systems preclude payment for hours not worked, these systems would, solely for that reason, be found to fail to meet the regulatory "salary basis" component of the exemption. In light of the public accountability principles prevalent in public sector pay systems, the regulatory requirements adopted before Congress extended FLSA coverage to State and local governments simply could not operate in a manner that effectively distinguished exempt from non-exempt public employees. The regulations were thus out of harmony with the intent of the statute because State and local governments could not practically avail themselves of the exemption intended by Congress, and thus were inappropriate as applied in the public sector.

5. On that date, the DOL passed an interim rule stating that the part-day docking provision did not apply to public employers. Because the relevant time-period for this action begins in December 1990, a determination of whether the part-day docking provision applies to public employers is necessary.

57 Fed.Reg. 37666, 37672 (1992). Thus, the DOL amended the salary basis test, eliminating application of the part-day docking rule to public employers. *See* 29 C.F.R. § 541.5d.

At least one court has stated that the DOL's statements and the amendment cannot be taken to mean that the DOL declared "its own regulation contrary to the statute and invalid *ab initio.*" *Kinney v. District of Columbia,* 994 F.2d 6, 10 (D.C.Cir.1993). Other courts have used the DOL's language, and the fact that the DOL initially wished to apply the amendment retroactively,[6] to support a finding that the part-day docking rule was invalid as applied to public employers. *See SEIU,* 60 F.3d at 1353; *Jackson v. Commonwealth of Kentucky,* 892 F.Supp. 923, 929 (E.D.Ky.1995); *McGrath v. City of Philadelphia,* 864 F.Supp. 466, 486 (E.D.Pa.1994). The DOL's statement and the subsequent amendment certainly evidence the DOL's belief that the part-day docking rule as applied to public employers conflicted with Congress's intent that public employers could claim the white-collar exemption. Such an opinion from the very agency that created the interpretation is persuasive evidence that the part-day docking rule as applied to public employers is contrary to congressional intent.

■ Ultimately, a review of the part-day docking rule and the FLSA's legislative history reveals a conflict. An employee who is in every respect a white-collar employee ought not to be deemed otherwise simply because his or her employer is bound by principles of public accountability and thus must dock the employee for time not actually worked. Accordingly, I hold that the part-day docking rule is invalid as applied to public employers because it conflicts with congressional intent.

6. *See* 57 Fed.Reg. 37678.

7. This subsection does provide that the employer may offset any amount an employee receives as jury or witness fees or military pay against the salary due for that week without losing the exemption. 29 C.F.R. § 541.118(a)(4).

8. Plaintiffs point to the fact that the TBTA reimbursed two employees for "inadvertent" deduc-

### 2. *Temporary Military Leave, Jury Duty, Attendance as a Witness*

In addition to the part-day docking rule, the salary basis test provides that "deductions may not be made for absences of an [exempt] employee caused by jury duty, attendance as a witness, or temporary military leave." 29 C.F.R. § 541.118(a)(4) (the "military, jury, or witness provision").[7] Although the DOL amended the salary basis test in 1992 so that the part-day docking provision no longer applied to public sector employees, it did not amend the military, jury, or witness provision. The DOL stated that it had examined the regulation in its entirety and determined that no other provision required amending. 57 Fed.Reg. 37666, 37673. Nevertheless, the exact same principles that led the DOL to amend the part-day docking provision apply here.

As stated above, principles of public accountability prevent public employers from paying their employees for time not spent working.[8] For example, while a private employer could pay an employee who missed two days of work while serving as a juror, a public employer could not pay the employee in the same situation because principles of public accountability would prevent the employer for paying the employee for time not worked. In fact, the only difference between absences for personal reasons addressed in the part-day docking rule and absences for service in the military, on a jury, or as a witness is that military service, jury service, and, in some instances, witness service are public functions. Therefore, it could be argued that public sector employees could receive their regular salaries without offending principles of public accountability because they would simply be receiving public funds for their public service. This argument is flawed. There are separate laws and regulations that provide for payment upon service

tions from their pay for military leave. This fact does not change the analysis. First, the military, jury, or witness provision on its face conflicts with principles of public accountability. Second, the fact that an employer has actually made payments to comply with the provision does not mean that the employer is not bound by principles of public accountability.

in the military, for a jury, or as a witness. Similarly, the pay scales are likely quite different for military, jury, or witness service as opposed to a managerial employee's regular salary. Finally, each of these public functions may in fact involve service for the federal government, not state or local governments. Thus, employees would not be entitled to the "same money" as they earned as a state or local employee.

█ The similarities between the part-day docking provision and the military, jury, or witness provision are far more compelling than the differences. Under both provisions, public employers have no control over whether their employees miss work. Under both provisions, public employers cannot satisfy the salary basis test *solely* because they cannot pay their employees for time not actually spent working. In fact, the entire DOL statement quoted above is as persuasive in revealing that the military, jury, or witness provision conflicts with congressional intent as it is in revealing the same flaw with the part-day docking provision. For the same reasons, therefore, application of the military, jury, or witness provision of the salary basis test to public employers conflicts with congressional intent. Therefore, I hold that this provision is invalid as applied to public employers.

### 3. *Disciplinary Penalties*

█ Unlike the Ninth Circuit in *SEIU*, I do not find that the flaws in the part-day docking rule and the military, jury, or witness provision invalidate the entire salary basis test. *See Quirk v. Baltimore County*, 895 F.Supp. 773, 780 (D.Md. Aug. 18, 1995). Instead, the provisions of the salary basis test applicable to disciplinary penalties remain to be considered. Subsection (5) of the salary basis test regulation provides that:

[p]enalties imposed in good faith for infractions of safety rules of major significance will not affect the employee's salaried sta-

tus. Safety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines.

29 C.F.R. § 541.118(a)(5).[9] Subsection 5 thus provides that salary deductions for "infractions of safety rules of major significance" will not cause a "salaried" employee to lose his exempt status. Section (a) and subsections (2) and (5) taken together, however, provide that an otherwise "salaried" employee will lose his exempt status if he is subject to docking for infractions of any disciplinary rules *other* than "safety rules of major significance." *See, e.g., Hurley v. State of Oregon*, 27 F.3d 392, 394 (9th Cir. 1994); *Klein v. Rush–Presbyterian–St. Luke's Medical Ctr.*, 990 F.2d 279, 285 (7th Cir.1993); *Lacey v. Indiana State Police Dep't*, 810 F.Supp. 244, 247 (S.D.Ind.1992).

In contrast to the sections discussed above, principles of public accountability do not prevent applying these provisions of the salary basis test to public employers. First, a deduction from an employee's salary for a minor disciplinary infraction does not involve the expenditure of public funds for hours not worked.[10] Assuming the penalty for such an infraction does not include suspension from work, which presumably would be too harsh a penalty for a minor violation in any event, the employer would never be forced to pay its employee for time not worked. *See Jackson*, 892 F.Supp. at 932. In fact, as the Seventh Circuit recently stated

[n]either the principle of public accountability, nor any other principle of public administration that has been drawn to our attention, makes it imperative that public employers have this power [to dock their employees less than a full week's pay as a penalty for a violation of work rules or other infractions] with respect to their ex-

---

**9.** A "safety rule of major significance" is one designed to protect the employer's property or the safety of the employees. *Avery v. City of Talladega*, 24 F.3d 1337, 1341–42 (11th Cir. 1994).

**10.** Of course, docking an employee for a partial day absence for personal reasons (*e.g.*, attending a parent-teacher conference) is different than docking an employee for disciplinary reasons (*e.g.*, repeatedly oversleeping and coming to work late as a result).

ecutive, administrative, and professional employees.

*Mueller v. Reich,* 54 F.3d 438, 442 (7th Cir. 1995).

Second, the nature of the problem faced by public employers is different. While a public employer cannot control whether its employees must take military leave, are called for jury duty, or must testify as a witness, an employer certainly can control the nature and extent of penalties it imposes for violations of its rules and regulations. It is two-faced for an employer to suspend an employee (less than a week) for violating a minor regulation and then to claim that principles of public accountability forbid it from paying the employee for not working those days.

Third, an employer can simply structure its disciplinary penalties for executives, administrators and professionals to comply with the salary basis test. There is no additional burden placed on public employers in fashioning such a disciplinary program that does not exist for private employers. *Id.* at 442–43; *Jackson,* 892 F.Supp. at 933. In fact, after December 3, 1993, the TBTA was indeed able to implement a disciplinary protocol that complied with the salary basis test.

■ Hence, when a public employer adopts a salary system that subjects its otherwise executive, administrative or professional employees to salary deductions of less than a week's pay for violations of rules other than "safety rules of major significance," it does so not because of principles of public accountability, but because it chooses to do so, thereby electing not to pay an employee who is otherwise "ready, willing, and able to work." 29 C.F.R. § 541.118(a)(1). For all these reasons, I hold that the disciplinary penalties provisions of the salary basis test are valid as applied to public employers.

Because these provisions are valid, I must now determine two other issues: (1) whether the TBTA implemented policies whereby its employees were subject to reductions in salary by violating rules other than safety rules of major significance and (2) whether the TBTA's exempt employees were subject to such policies.

**B.** *The TBTA's Disciplinary Policy*

■ Because I find that the part-day docking provision and the military, jury, or witness provision of the salary basis test are invalid as applied to public employers, I need not review the TBTA's policies or practices with regard to those matters. The TBTA's otherwise salaried employees cannot lose their exempt status even if these provisions of the salary basis test were violated. What is left for my determination is whether the TBTA adopted a plan whereby its employees were subject to reductions in salary for infractions of rules other than safety rules of major significance.

■ The TBTA implemented several policies and procedures that provide for salary deductions in less than full week increments for violations of rules other than safety rules of major significance. Examples of such policies include failure to document leave because of a death in the family (Pl.App.Exh. A at 6), failure to document absences due to illness (*id.* at 4), and misuse of an official vehicle (Williams Dep. at 116). These policies plainly violate the proscription against imposing pay deductions for violations of rules other than safety rules of major significance. *Yourman,* 826 F.Supp. at 741; *see also Shockley v. City of Newport News,* 997 F.2d 18, 24–25 (4th Cir.1993); *Klein,* 990 F.2d at 284–87; *Lacey,* 810 F.Supp. at 248. The TBTA fairly argues that plaintiffs, as relatively high-paid managers and executives, did not expect to be paid overtime when they were hired. By the same token, however, plaintiffs did not expect, when they were hired as managers and executives, to be subjected to discipline in the form of the docking of their salaries for minor disciplinary infractions. Accordingly, it is clear that the TBTA promulgated policies that, on their face, permitted the TBTA to impose salary deductions for violations of rules other than safety rules of major significance.

**C.** *Defenses*

The TBTA raises two principal defenses to its imposition of these impermissible policies. First, the TBTA argues that the mere theoretical possibility that its policies subjected its employees to deductions from pay is in-

sufficient to violate the salary basis test and thus disqualify plaintiffs from the exemption under § 213(a)(1). Relying on this theory, the TBTA then notes that only two employees, Henry Zebrowski and Joshua Klapper, actually received salary deductions as a result of disciplinary suspensions and both of these deductions were corrected through the "window of corrections" provided for in the salary basis test. Second, the TBTA argues that even if the "subject to" language does not require actual deductions, plaintiffs did not face the possibility of impermissible deductions because the disciplinary policies at issue were not *applicable* to exempt employees.

### 1. *The Meaning of "Subject To Reduction"*

The TBTA correctly points out that many courts have held that the "subject to" language in the salary basis test requires an actual deduction based on the quantity or quality of an employee's work, not the mere possibility that such a deduction could occur. *See, e.g., Barner v. City of Novato,* 17 F.3d 1256, 1262 (9th Cir.1994) (where there was no express policy of deducting from exempt employees' pay, employer must actually make deductions to lose exemption); *McDonnell v. City of Omaha,* 999 F.2d 293, 297 (8th Cir. 1993) ("subject to" language does not mean that a possible or contingent reduction in salary violates salary basis test), *cert. denied,* —— U.S. ——, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994); *Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta,* 920 F.2d 800, 805 (11th Cir.1991) (actual deduction must be shown before exemption is lost); *McGrath v. City of Philadelphia,* 864 F.Supp. 466, 488 (E.D.Pa.1994) (actual violation of salary basis test required before exemption is lost); *see also York v. City of Wichita Falls,* 944 F.2d 236, 242 (5th Cir.1991) (salary basis test satisfied because of a lack of evidence of either actual deductions or a policy of docking pay).

 Notwithstanding this litany of cases holding that the "subject to" language in the

salary basis test requires an actual deduction from an employee's salary, the Second Circuit has embraced the opposing view. The Second Circuit plainly adopted the Ninth Circuit's reasoning in *Abshire v. County of Kern,* 908 F.2d 483 (9th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 785, 112 L.Ed.2d 848 (1991), that an employee's salary is "subject to reduction" when "an employer maintains the discretion to reduce an employee's compensation as a result of the employee's hours or the quality of the employee's work...." *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 615 (2d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992). Moreover, it is evident that the Second Circuit did not "blindly follow[ ] the lead of the Ninth Circuit [in *Abshire* ]," as the court cites a plethora of cases, including two Second Circuit cases, supporting this interpretation of "subject to reduction."[11] *Id.* at 615 (*citing Whitmore v. Port Auth. of New York & New Jersey,* 907 F.2d 20, 21 (2d Cir.1990); *Donovan v. Carls Drug Co.,* 703 F.2d 650, 652 (2d Cir.1983); *Harrison v. District of Columbia,* Nos. 87–0808; – 2275; 88–1028; –3223, 1991 WL 104260, at *5 (D.D.C. Apr. 16, 1991); *Wilks v. District of Columbia,* 721 F.Supp. 1383, 1385 (D.D.C. 1989); *Banks v. City of North Little Rock,* 708 F.Supp. 1023, 1025 (E.D.Ark.1988); *Hawks v. City of Newport News,* 707 F.Supp. 212, 214–15 (E.D.Va.1988); *Persons v. City of Gresham,* 704 F.Supp. 191, 194 (D.Or. 1988); *Knecht v. City of Redwood City,* 683 F.Supp. 1307, 1311 (N.D.Cal.1987)). Accordingly, in this circuit, employees are "subject to" reductions in their salary if the employer implements a plan that provides for such deductions, whether or not such deductions are in fact made. *Yourman,* 826 F.Supp. at 743–44.

### 2. *Applicability of TBTA Policies to Exempt Employees*

The TBTA claims that, despite the existence of various disciplinary policies that provide for deductions from pay for violations of rules other than safety rules of major signifi-

---

**11.** Because *Martin* relies on a number of cases involving public employers, it is irrelevant that *Martin* itself involved a private employer. *Your-*

*man v. Dinkins,* 826 F.Supp. 736, 744 (S.D.N.Y. 1993).

cance, plaintiffs were never subject to improper deductions from compensation because these policies were not *applicable* to the plaintiffs. In other words, the TBTA argues that plaintiffs could not have been docked in less than full week increments for disciplinary violations because plaintiffs were not, in fact, "subject to" these provisions, and therefore it has not violated the salary basis test. This claim is belied in many respects by the plain language of the documents. The Managerial Time and Leave System, as its title indicates, certainly appears to apply to managerial employees. The same is true with the TBTA Handbook, which is a reference tool for all TBTA employees, and the other policy statements attached to Plaintiffs' Appendix A, each of which addresses all TBTA employees.

The TBTA counters this documentary evidence with sworn deposition testimony from Robert M. O'Brien, TBTA's general counsel, and Edna Williams, TBTA's director of personnel. Mr. O'Brien testified that exempt employees were not subject to fines or suspensions in less than one week increments. (O'Brien Dep. at 46). Explaining why there was no document that set forth this exception to TBTA's general policies, O'Brien testified that he had to approve every suspension or fine of a TBTA employee. (*Id.* at 47).

Similarly, while Ms. Williams testified that the TBTA maintained the discretion to discipline managerial employees for violations of rules other than safety rules of major significance, she added that the discipline could not be a deduction in pay. (Williams Dep. at 39–42). As summarized by Ms. Williams, "[t]he employee may be subject to disciplinary action, but disciplinary action does not mean that the employee will be without pay." (*Id.* at 42). Thus, the TBTA claims that the penalties described in the various policy statements described above were not applicable to exempt employees.

■ Plaintiffs assert that Williams and O'Brien's deposition testimony contradicts statements included in affidavits, are duplicitous, and, in short, should not be believed. I am constrained by the procedural posture of this case, however, from making these credibility determinations at this juncture. It is well-settled that credibility determinations are the province of the finder of fact, not a judge, and thus should not be made when considering a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994). Thus, for the purposes of this motion, I must credit the testimony of Williams and O'Brien that exempt employees were not subject to deductions in compensation of less than a week.

■ Of course, this testimony is not accorded greater weight at this point than the documentary evidence indicating that the exempt employees were indeed subject to partial-week deductions in pay for disciplinary violations. Accordingly, a genuine issue of material fact remains on a single issue: whether managerial employees of the TBTA were subject to deductions in pay for violations of rules other than safety rules of major significance.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion for partial summary judgment and defendant's motion for summary motion are denied. Counsel for the parties are to appear for a pretrial conference on November 3, 1995 at 11:00 a.m. in Courtroom 11A of the Courthouse at 500 Pearl Street.

SO ORDERED.