**Debra CASH, et al., individually and on behalf of others similarly situated, Plaintiffs,**

v.

**CONN APPLIANCES, INC., et al., Defendants.**

**No. 1:96 CV 432 (TH).**

United States District Court, E.D. Texas, Beaumont Division.

Nov. 18, 1997.

to the occurrence or the parties. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Brett Scott Thomas, Beaumont, TX, Paul Michael Hood, Kimberly Ann Morey, Keith H. Cole & Michael C. Dodge, Dallas, TX, for Plaintiffs.

Robert J. Hambright, George Michael Jamail & Jacqueline B. Ryall, Beaumont, TX, for Defendant.

### AMENDED MEMORANDUM OPINION

HEARTFIELD, District Judge.

Plaintiffs, Debra Cash,[1] Charles Prater, Christina Stroder, Anthony Lucia, Nancy Malbrough, Roderick Harrington, Krystal Johnson, Byron Neatherly and Roger Chambers, sue defendants, Conn Appliances, Inc., Conn Credit Corporation, Conn Rental, Inc., Appliance Parts & Service, Conn Development Corporation and Merchants Acceptance Corporation, for improperly compensating them for overtime work in violation of the Fair Labor Standards Act of 1938 (FLSA). Defendants move for entry of summary judgment against plaintiffs individually as to how plaintiffs' overtime pay was calculated, limi-

tations and damages. Plaintiffs seek permission to transform this case into a FLSA collective action. The court grants defendants' motion for summary judgment on the issue of the manner in which plaintiffs' overtime compensation was calculated and denies the motion on the issues of limitations and damages as moot. That disposition leads it to deny plaintiffs' motion for this case to proceed as a FLSA collective action to the extent that this request rests on arguments raised in opposition to the summary judgment motion.

### SUMMARY JUDGMENT STANDARD

"Federal Rule of Civil Procedure 56 © provides that a grant of summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Pollock v. Federal Deposit Ins. Corp.*, 17 F.3d 798, 803 (5th Cir.1994). "The mere existence of a factual dispute does not by itself preclude the granting of summary judgment. '[T]he requirement is that there be no *genuine* issue of *material* fact.'" *St. Amant v. Benoit,* 806 F.2d 1294, 1297 (5th Cir.1987). "The substantive law ... identif[ies] which facts are material." *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *see Texas Manufactured Housing Ass'n, Inc. v. City of Nederland,* 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). "There is no genuine issue of material fact if the evidence is such that, drawing all reasonable inferences in favor of the non-movant, ... a reasonable jury could not return a verdict in [her] ... favor." *Atkinson v. Denton Pub. Co.,* 84 F.3d 144, 148 (5th Cir.1996); *see Stults v. Conoco, Inc.,* 76 F.3d 651, 654 (5th Cir.1996).

The actual operation of the summary judgment standard depends on whether the moving or nonmoving party bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317, 328 (1993); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct.

---

**1.** Debra Cash appears once in the summary judgment record as Debra Honea. *Compare* Defs.' Mot. for Summ. J. [hereinafter Mot.] (Ex. B (Aff. of Kellye Badon ¶ 8 [hereinafter Badon Aff.] (stating that Exhibit 2 includes a form relating to Debra Cash))) *with* Badon Aff. Attach. 2 (copy of "Understanding My Method of Compensation" form signed by Debra Honea).

2505, 2513, 91 L.Ed.2d 202, 215 (1986). When the nonmoving party bears the burden of proof at trial, the moving party can carry its summary judgment burden by either "affirmatively offer[ing] evidence which undermines one or more of the essential elements of the [nonmoving party's] ... case[ ] or[ ] ... demonstrat[ing] that the evidence in the [summary judgment] record falls short of establishing an essential element of the [nonmoving party's] ... case." *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir.1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). When the moving party meets its summary judgment burden, the nonmoving party must point to evidence sufficient for a reasonable jury to return a verdict in her favor to avoid having summary judgment entered against her. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11, 91 L.Ed.2d at 212–13; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273–74 (1986); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *James v. Otis Elevator Co.*, 854 F.2d 429, 432 n. 3 (11th Cir.1988). In contrast, when the moving party bears the burden of proof at trial, it must "come forward with evidence which would 'entitle it to a [judgment as a matter of law] ... if the evidence went uncontroverted' " to satisfy its summary judgment burden. *International Shortstop*, 939 F.2d at 1264–65; *see also Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir.1996). The nonmoving party responds by either presenting evidence sufficient for a reasonable jury to return a verdict in her favor or exposing the moving party's evidence as inadequate for a reasonable jury to return a verdict in its favor. *See International Shortstop*, 939 F.2d at 1265; *see also Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 802 (5th Cir. 1993). In the face of a properly supported motion, the failure to accomplish one of these feats leads to the granting of summary judgment to the moving party. *See Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1322 (5th Cir.1992), *cert. denied*, 506 U.S. 1048, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993).

"The pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits in support [of] or in opposition to the motion [usually] constitute the summary judgment record." *Kelley v. Price–Macemon, Inc.*, 992 F.2d 1408, 1415 n. 12 (5th Cir.1993), *cert. denied*, 510 U.S. 1043, 114 S.Ct. 688, 126 L.Ed.2d 656 (1994). However, these "forms of evidence ... are not the exclusive ways for presenting evidence in a [summary judgment] proceeding." *Duffee By and Through Thornton v. Murray Ohio Mfg. Co.*, 160 F.R.D. 602, 604 (D.Kan.1995). Anything that "[is] ... included in the pretrial record and that would [be] ... admissible evidence [at trial] may receive consideration." *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir.1995); *see Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996). A court, however, is under no obligation to look beyond the materials to which the parties point to resolve a summary judgment motion. *See* E.D.Tex.R. CV–56(c); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992); *see also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982) ("A party may not prevail in opposing a motion for summary judgment by simply overwhelming the district court with a miscellany of unorganized documentation."), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983).

A court's assessment of the summary judgment record must include no "evaluat[ion of] the credibility of witnesses, weigh[ing of] the evidence, [or] ... resolu[tion of] factual disputes." *International Shortstop*, 939 F.2d at 1263. As "long as the evidence ... is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, [it] ... must deny the motion." *Id.*

### FLSA

#### Overview

■ "Using its power under the [Constitution's] Commerce Clause ..., Congress enacted in 1938 the [FLSA] ... to establish labor standards in order to maintain the 'minimum standard of living necessary for health, efficiency, and general well-being of workers.' " *Jacksonville Prof'l Firefighters Ass'n Local 2961, IAFF v. City of Jacksonville*, 685 F.Supp. 513, 517 (E.D.N.C.1987). "The two central themes of the FLSA are

**890**

... minimum wage and overtime requirements." *Arnold v. State,* 910 F.Supp. 1385, 1392 (E.D.Ark.1995); *see Barrentine v. Arkansas–Best Freight Sys.,* 450 U.S. 728, 739, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641, 653 (1981) (discussing the FLSA's purpose). "Section [6] ... of the FLSA mandates [an] ... hourly minimum wage due to all employees[, while] ... Section [7] delineates maximum work hour limitations." *Monahan v. County of Chesterfield, Va.,* 95 F.3d 1263, 1267 (4th Cir.1996).

▪ The Wage and Hour Division of the United States Department of Labor (DOL) administers the FLSA. *See 22 Federal Procedure* § 52:303 (1984) (citing 29 U.S.C. § 204(a)). Pursuant to a delegation of authority by the Secretary of Labor, the head of that entity, known as the Administrator, issues administrative rules on the FLSA.[2] *Id.* He offers his interpretations of those rules in opinion letters and the *Wage and Hour Division Field Operations Handbook (Handbook). See Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 417–18, 65 S.Ct. 1215, 1219, 89 L.Ed. 1700, 1704–05 (1945) *see also National Medical Enterprises, Inc. v. Shalala,*

43 F.3d 691, 696–97 (D.C.Cir.1995); *Caro–Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1508 (11th Cir.1993); 3 Charles H. Koch, Jr. *Administrative Law and Practice* § 11.26 (2d ed.1997). He may withdraw or revise these pronouncements at any time. *See* 29 C.F.R. §§ 775.1, 778.3; *see also Taylor–Callahan–Coleman Counties Dist. Adult Probation Dep't v. Dole,* 948 F.2d 953, 957–59 (5th Cir .1991).

▪ Construction of administrative rules relating to the FLSA constitutes part of the judicial function.[3] A court undertaking this enterprise first consults the plain language of the rule at issue.[4] *See Bowles,* 325 U.S. at 413–14, 65 S.Ct. at 1217, 89 L.Ed. at 1702–03; *see also Greyhound Corp. v. Mount Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239, 246 (1978) ("The starting point in every case involving a construction of a statute is the language itself."). When the words themselves prove inconclusive, it looks to the Administrator's reading of the rule.[5] *See Bowles,* 325 U.S. at 413–14, 65 S.Ct. at 1217, 89 L.Ed. at 1702–03. That interpretation possesses "controlling weight" so long as it

**2.** Administrative rules separate into two classes, legislative and interpretive. *See Brown Express, Inc. v. United States,* 607 F.2d 695, 700 (5th Cir.1979). "[I]t seems to be established that ... 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or [legislative rule] ... means." *Id.* (internal quotations omitted) (quoting *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952)). The administrative rules central to this case, those appearing in Part 778 of Title 29 to the Code of Federal Regulation (C.F.R.) (Part 778) and Section 541.118(a) of Title 29 to the C.F.R. (Section 541.118(a)), have been construed as interpretive. *See Monahan,* 95 F.3d at 1273 n. 10 (Part 778 contains interpretive rules); *McCloskey v. Triborough Bridge,* 903 F.Supp. 558, 565 (S.D.N.Y. 1995) (Section 541.118(a) is "simply an interpretation"). *See generally Sherwood v. Washington Post,* 871 F.Supp. 1471, 1474–75 (D.D.C.1994) (noting that a "regulation" is the same as a legislative rule, but different from an interpretive rule).

**3.** Principles of statutory interpretation guide construction of rules. *See* 1A Norman J. Singer, *Sutherland Statutory Construction* § 31.06 (5th ed.1993).

**4.** The rule's language generally takes its plain meaning. *See Louisiana Debating and Literary Ass'n v. City of New Orleans,* 42 F.3d 1483, 1491

(5th Cir.), *cert. denied,* 515 U.S. 1145, 115 S.Ct. 2583, 132 L.Ed.2d 832 (1995); *see also* 3 Koch, *supra* § 11.26. It, however, "must always be read in ... proper context." *In re Locklin,* 101 F.3d 435, 439 (5th Cir.1996); *see also* 3 Koch, *supra* § 11.26.

**5.** In contrast to Administrator's expressions, views of low level DOL officials about rules concerning the FLSA carry no weight. *See 22 Federal Procedure, supra* § 52:632 (Wage and Hour Division inspectors "are not ... authorized to make any written statements expressing an interpretive position or purporting to state Wage and Hour Division or Department of Labor policy or procedure") ("determinations of a Wage and Hour Division local office will not be accorded weight by the courts"). *Compare* 29 C.F.R. § 790.19(b) (advice of a Wage and Hour Division field inspector affords no entitlement to protection under Section 259(a) of Title 29 to the United States Code, which excuses from FLSA liability employers relying in good faith on any written regular, order, ruling, approval or interpretation of the Administrator or on an administrative practice or enforcement policy of the Administrator) *with Roy v. County of Lexington,* 928 F.Supp. 1406, 1420–21 (D.S.C.1996) ("an enforcement officer of the Wage and Hour Division cannot establish a practice or policy" of the Administrator), *partially vacated on other grounds,* 948 F.Supp. 529 (D.S.C.1996) *and Petr-*

"does not violate the Constitution or federal statute ... [and] 'is [not] plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598, 608 (1993). If the Administrator offers no statement settling the rule's meaning, then a court resorts to other interpretive tools.[6] *See* 3 Koch, *supra* § 11.26; *cf. Rucker v. Wabash R.R.*, 418 F.2d 146, 149–50 (7th Cir.1969).

### Overtime Requirement
### Background

The FLSA's provision on maximum hours, Section 7, demarcates forty as the greatest number of hours that can comprise a workweek, "unless the employee receives compensation for the hours in excess of forty at a rate not less than one and one-half times the 'regular rate at which he [or she] is employed.'"[7] *Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 152 (5th Cir.1982) (citing and quoting 29 U.S.C. § 207(a)(1)). The Administrator defines the "regular rate" as "a rate per hour." 29 C.F.R. § 778.109. He instructs employers to

determine the regular rate "by dividing ... total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by [the employee] ... in that workweek for which such compensation was paid."[8] *Id.* This directive controls regardless of whether the employee receives her compensation "on a piece-rate, salary, commission, or other basis."[9] *Id.; see, e.g., id.* § 778.113(b) (a monthly salary is translated into a weekly salary by multiplying the monthly salary by twelve) (i.e., the number of months in a year) and dividing the result by fifty-two (i.e., the number of weeks in a year); *see also Aaron v. City of Wichita, Kan.*, 54 F.3d 652, 655 (10th Cir.1995) ("The regular rate is the rate per hour, but employers are not required to compensate employees on an hourly basis."), *cert. denied*, 516 U.S. 965, 116 S.Ct. 419, 133 L.Ed.2d 336 (1995).

Employers can withhold employee pay for some reasons, such as discipline. *See* 29 C.F.R. §§ 778.304(a), 778.307. However, in doing so, they must use earnings *sans* those pay reductions to figure the regular rate.[10]

---

*lik v. Community Realty Co.*, 347 F.Supp. 638, 643 (D.Md.1972) (" 'authoritative' rulings and interpretations of the agency needed for [the good faith] ... defense [under Section 259(a)] are those issued by the Administrator ... and not by regional or field officials").

**6.** In this case, the following intrinsic aids to interpretation prove helpful: (1) the canon of statutory construction that "the use of the disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately," *Quindlen v. Prudential Ins. Co.*, 482 F.2d 876, 878 (5th Cir.1973); *see also United States v. Property Known as 6109 Grubb Rd.*, 886 F.2d 618, 626 (3d Cir.1989), and (2) a rule's structure, *see, e.g., Metropolitan Stevedore Co. v. Rambo*, 515 U.S. 291, 295, 115 S.Ct. 2144, 2148, 132 L.Ed.2d 226, 233 (1995). The following extrinsic aids also afford assistance: (1) earlier versions of the rules at issue, *see* 2B Singer, *supra* § 51.04, (2) rules related to the rules at issue, *see id.* §§ 51.01–.03. As to the latter extrinsic aid, its corollary, that rules regarding the same matter should be read harmoniously when the text permits, also pertains. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738–39, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598, 628–29 (1989) (Scalia, J., concurring in part and concurring in judgment); *Rice v. Martin Marietta Corp.*, 13 F.3d 1563 1568 (Fed.Cir.1993); 2B Singer, *supra* § 51.02.

**7.** For the remainder of this memorandum opinion, the court refers to the FLSA's mandate that

a worker's overtime compensation equal at least to one-and-a-half times the regular rate at which she is employed as the "overtime requirement."

**8.** The Administrator defines "workweek" as "a fixed and regularly recurring period of 168 hours—seven consecutive 24-hour periods." 29 C.F.R. § 778.105.

**9.** Discussion of how the general formula for figuring overtime compensation applies to different remunerative contexts appear in Sections 778.110 to 778.122 of Title 29 to the C.F.R. *See id.* §§ 778.110–.122; *cf. infra* note 19.

**10.** Section 778.307 of Title 29 to the C.F.R. (Section 778.307) states that two types of deductions from compensation—those for items such as tools and uniforms not regarded as "facilities" and those for disciplinary reasons—may never "reduce earnings to an average below the applicable minimum wage or cut into any part of overtime compensation due the employee." *Id.* § 778.307. Although this comment appears in an illustration involving a worker paid on a piece-rate basis, *see id.*, it appears to convey a general rule, *see* 48A Am.Jur.2d *Labor and Law Relations* § 4314 (1994) (seeming to view the example regarding deductions from a worker paid on a piece-rate basis as declaring a general rule); *see also infra* note 25.

*Id.* § 778.304(b); *see, e.g., id.* §§ 778.305, 778.307.

■ The FLSA excepts and exempts some workers from the overtime requirement. *See, e.g.,* 29 C.F.R. §§ 778.2, 778.107. For example, it excludes from coverage individuals serving in "bona fide executive, administrative, or professional capacities."[11] 29 U.S.C. § 213(a); *see Hennessey v. United States Dep't of Defense,* 46 F.3d 356, 359 (4th Cir.1995). These workers, consequently, possess no entitlement to extra compensation for laboring more than forty hours in a week. *See Jackson v. Commonwealth,* 892 F.Supp. 923, 925 (E.D.Ky.1995); *see also Balgowan v. State,* 115 F.3d 214, 216 n. 1 (3d Cir.1997).

■ The employee who performs certain duties (duties test) and is paid on a salary-basis (salary-basis test)[12] qualifies for the white collar exemption. *See Auer,* 519 U.S. at ——, 117 S.Ct. at 908, 137 L.Ed.2d at 86. The second condition fails to be met when her salary is subject to reduction because of absences of less than a day[13] or because of

disciplinary violations other than those involving safety rules of major significance.[14] *See* 29 C.F.R. §§ 541.118(a)(2)–(3), (5); *Auer,* 519 U.S. at ——, 117 S.Ct. at 910–11, 137 L.Ed.2d at 89–90; *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 615 (2d Cir.1991), *cert. denied,* 506 U.S. 905, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992); *Abshire v. County of Kern,* 908 F.2d 483, 486 (9th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 785, 112 L.Ed.2d 848 (1991); *Klein,* 990 F.2d at 281, 284–85; *Lacey,* 810 F.Supp. at 247; *cf. McCloskey,* 903 F.Supp. at 562–63.

■ The employee alleging a violation of the overtime requirement bears the burden of proving the following prima facie case by a preponderance of the evidence: "[T]hat there exists an employer-employee relationship; that there was engagement in activities within the coverage of the [FLSA] ...; that the employer violated the [overtime] wage requirements; and that a definite amount of compensation is due."[15] *Fight v. Armour & Co.,* 533 F.Supp. 998, 1004 (W.D.Ark.1982); *see Reed v. R.C. Johnson,* No. Civ.A. 93–

11. The exemption for persons working in bona fide executive, administrative, professional capacities is known as the white collar exemption. *See, e.g., McCloskey,* 903 F.Supp. at 562. The FLSA directs the Secretary of Labor to "defin[e] and delimit" it. 29 U.S.C. § 213(a)(1). The Secretary has delegated that responsibility to the Administrator. *See* 29 C.F.R. § 541.1. (Originally, the FLSA empowered the Administrator to delineate the white collar exemption). *See* 1941 *Wage and Hour Man.* (BNA) 423 [hereinafter *W & H Man.* ] (reprinting the original text of 29 U.S.C. § 213(a)(1)).

12. The following components comprise the salary-basis test: (1) a compensatory standard, which appears in the rule defining the particular type of exempt employee (i.e., executive, administrative or professional) and (2) a list of conditions that must be met for the employee to be deemed as paid on a salary basis, which appears in Section 541.118(a). *See Auer v. Robbins,* 519 U.S. 452, ——, 117 S.Ct. 905, 908, 137 L.Ed.2d 79, 86 (1997); *Barner v. City of Novato,* 17 F.3d 1256, 1259–60 (9th Cir.1994). The first part of the test was introduced in 1940. *See* 5 *Fed.Reg.* 4077–78 (1940) (announcing new legislative rules on the white collar exemption). (The Administrator provided an extensive interpretation of this portion of the salary-basis test at that time. *See W & H Man., supra,* at 426–68.) The second part was announced in 1949. *See* 14 *Fed.Reg.* 7730, 7732 (1949) (presenting an explanatory bulletin on the legislative rules regarding the white collar exemption). The entire sala-

ry-basis test "has existed largely in its present form since 1954." *Auer,* 519 U.S. at ——, 117 S.Ct. at 908, 137 L.Ed.2d at 86.

13. Deductions for absences of less than a day falling within the Family and Medical Leave Act of 1993 (FMLA) constitute no breach of the salary-basis test. *See* 29 U.S.C. § 2612(c). Section 825.206 of Title 29 to the C.F.R. (Section 825.206) permits the employer to "make deductions from the [bona fide executive, administrative or professional] employee's salary for any hours taken as intermittent or reduced FMLA leave within a workweek." 29 C.F.R. § 825.206(a). (For definitions of intermittent FMLA leave and reduced FMLA leave, *see id.* § 825.203.)

14. "Safety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines." *Id.* § 541.118(a)(5). A requirement that the employee to come to work on time falls outside of this class. *See Klein v. Rush–Presbyterian–St. Luke's Med. Ctr.,* 990 F.2d 279, 281, 284–85 (7th Cir.1993); *Lacey v. Indiana State Police Dep't,* 810 F.Supp. 244, 247 (S.D.Ind.1992).

15. Workers can enforce their FLSA rights directly. *See Barrentine,* 450 U.S. at 740, 101 S.Ct. at 1444, 67 L.Ed.2d at 653 (discussing 29 U.S.C. § 216(b)).

1652, 1995 WL 684882, at *1 (E.D.La. Nov.13, 1995); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515, 1522 (1946); *Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir.1986); *Reeves v. International Tel. and Tel. Corp.*, 616 F.2d 1342, 1351 (5th Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981). If she does so, then the employer escapes liability only by showing by a preponderance of the evidence that the employee falls within an exception or exemption to the overtime requirement. *See Reed*, 1995 WL 684882, at *1; *Fight*, 533 F.Supp. at 1004; *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1, 10–11 (1974).

### Fluctuating Workweek Method

▇▇▇▇ The Administrator describes a method for determining the overtime pay due the employee who receives a salary and whose hours of work vary from week-to-week in Section 778.114 of Title 29 to the C.F.R.

(Section 778.114).[16] *See* 29 C.F.R. §§ 778.109, 778.114. According to him, the regular rate in this circumstance is salary divided by the total number of hours worked during the week.[17] *Id.* § 778.114(a); *accord Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580, 62 S.Ct. 1216, 1221, 86 L.Ed. 1682, 1689 (1942). As the salary covers all hours at the regular rate, that sum and the product of one-half the regular rate and the number of hours over forty worked results in total compensation for the week including overtime pay equal to one-and-a-half times the regular rate.[18] *See* 29 C.F.R. § 778.114(a); *Condo v. Sysco, Corp.*, 1 F.3d 599, 605 (7th Cir.1993), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994); *Knight v. Morris*, 693 F.Supp. 439, 445 & n. 5 (W.D.Va.1988).

The fluctuating workweek method produces overtime awards lower than those resulting when a fixed hourly amount or the quotient of a salary for forty hours and forty serves as the regular rate.[19] *See* Gaskill,

16. The manner of calculating overtime compensation for the salaried employee whose hours differ from week-to-week, known as the fluctuating workweek method, is neither an exception nor an exemption to the overtime requirement. *See* 29 C.F.R. §§ 778.2, 778.107. *But see, e.g., Monahan*, 95 F.3d at 1281 ("the fluctuating workweek method of payment ... is an exemption to the strict overtime requirements of the FLSA and ... results in the salaried employee receiving half-time overtime rather than time and a half overtime"). It was introduced on October 21, 1938, three days before the FLSA took effect, in a document entitled Interpretative Bulletin No. 4. *See Missel v. Overnight Transp. Co.*, 126 F.2d 98, 108 n. 27 (4th Cir.1942), *rev'd*, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942). Interpretative Bulletin was revised in December, 1939. *W & H Man., supra*, at 127. Some provisions were added to it in July, 1940. *Id.* In November, 1940, it was amended "to conform with changes in [the FLSA's] hours provisions effective Oct[ober] 24, 1940." *Id. See generally id.* (paragraph 1 of the version of Interpretative Bulletin No. 4 that took effect in November, 1940 (relating the change to the FLSA's maximum hour provision effective October 24, 1940)). Much of the substance of the November, 1940, version of Interpretative Bulletin No. 4 provided the basis for the Administrator's contemporary description of the fluctuating workweek method, which appears at Section 778.114. *Compare id.* at 127–44 (reprinting revised Interpretative Bulletin No. 4) *with* 29 C.F.R. § 778.114. *See generally* 2B Singer, *supra* § 51.04. (For the remainder of this memorandum opinion, references to "Interpretative Bul-

letin No. 4" allude to the November, 1940, version of Interpretative Bulletin No. 4.)

17. When the employee receives certain types of bonuses, including awards promised in return for outstanding productivity, determination of the regular rate involves dividing the sum of salary and those bonuses by the total number of hours worked during the week. *See* 29 C.F.R. §§ 778.114(a), 778.208–.09, 778.211; *Parisi v. Town of Salem*, No. 95–67–JD, 1997 WL 228509, at *2–3 (D.N.H. Feb.20, 1997); Jean Gaskill, *Methods of Calculating Overtime Compensation Under the Fair Labor Standards Act—Variations on the Theme*, 548 PLI/Lit 885, 901–04 (1996).

18. A coefficient table created by the DOL facilitates computation of overtime pay under the fluctuating workweek method. Specifically, to determine overtime compensation using it, one simply multiplies weekly salary by the coefficient corresponding to the total number of hours worked during the week. *See* Mot. Ex. D [hereinafter Coefficient Table]; *see also Hodgson v. Prior*, 340 F.Supp. 386, 388 (S.D.Ohio 1972). The coefficient table also makes figuring overtime compensation due the employee who earns both salary and bonuses in a week easy. *See* Coefficient Table.

19. When either a fixed hourly amount or the quotient of a salary for forty hours and forty constitutes the regular rate, overtime compensation equals the product of the number of hours over forty and one-and-a-half times the regular rate. *See* Gaskill, *supra*, at 891, 897; *see also* 29

*supra,* at 897–901, 904; *see also Overnight Motor,* 316 U.S. at 580, 62 S.Ct. at 1221, 86 L.Ed. at 1689 ("It is true that the longer the hours the less the rate and the pay per hour."). For the employer to use this economically advantageous approach, three conditions must prevail. *See* Gaskill, *supra,* at 900–01.

First, the employer must reach a clear understanding with the employee "that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number" (clear understanding criterion). 29 C.F.R. § 778.114(a); *see also id.* § 778.114(c). This meeting-of-the-minds usually is memorialized in writing at the outset of the employment relationship. *See Highlander v. KFC Nat'l Management Co.,* 805 F.2d 644, 645–46, 648 (6th Cir.1986); *Condo v. Sysco Corp.,* No. 92 C 802, 1992 WL 317199, at *3 (N.D.Ill. Oct. 28, 1992), *aff'd,* 1 F.3d 599 (7th Cir.1993), *cert. denied,* 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994). In the absence of such a situation, it can arise through "employment policies, practices and procedures." *Monahan,* 95 F.3d at 1275 n. 12; *see Mayhew v. Wells,* 125 F.3d 216, 219 (4th Cir.1997) (existence of clear understanding criterion can be " 'based on the implied terms of one's employment agreement if it is clear from the employee's actions that he or she understood the payment plan in spite of after-the-fact verbal contentions otherwise' ").

Second, the employee's salary must be large enough to ensure that her average hourly rate never dips under the applicable minimum wage (minimum wage criterion).[20] *See* 29 C.F.R. § 778.114(c). This condition exists if salary actually proves adequate to sustain an average hourly rate at least equal to the applicable minimum wage. *See id.* It also prevails if salary "is reasonably calculated to provide" an average hourly rate at least equal to the applicable minimum wage. Opinion Letter No. 945, [___ Wages–Hours Lab.L.Rep.(CCH) ¶ 30,957 (Feb. 6, 1969)] [hereinafter Opinion Letter No. 945]; *see* Opinion Letter No. 1010, [___ Wages–Hours] Lab.L.Rep. (CCH) ¶ 30,557 (June 12, 1969) [hereinafter Opinion Letter No. 1010]. The latter situation relates to those infrequent occasions when unforeseen events cause the employee to work so many hours that her salary fails to support an average hourly rate at least equal to the applicable minimum wage. *See* Opinion Letter No. 945; *see also* Opinion Letter No. 1010. In such a circumstance, the employer must give the employee (1) an additional amount sufficient to generate an average hourly rate equal to the applicable minimum wage when that amount is added to salary and the result is divided by the number of hours worked[21] and (2) the difference between the amount of overtime compensation yielded under the fluctuating workweek method when the product of the applicable minimum wage and the number of hours worked serves as the salary figure and the amount of overtime compensation actually paid.[22] *See* Opinion Letter No. 945; *see also Blackmon v. Brookshire Grocery Co.,* 835 F.2d 1135, 1138 n. 1 (5th Cir.1988); *cf.* Opinion Letter No. 1010 ("For purposes of administrative settlement only, back wages

---

C.F.R. §§ 778.110, 778.113. The manner of determining overtime pay when a fixed hourly amount equals the regular rate is known as the hourly rate method, while the manner of determining overtime pay when the quotient of a salary for forty hours and forty equals the regular rate is known the flat salary method. *See* Gaskill, *supra,* at 891–92, 902. These two methods are "the traditional and most common approaches to overtime compensation." *Id.* at 894.

**20.** For the remainder of this memorandum opinion, the court refers to specific cases in the average hourly rate was less than the applicable minimum wage as either "minimum wage violations" or "minimum wage breaches."

**21.** Salary, as to the minimum wage criterion, means just salary, not salary plus other payments that together yield an average hourly rate equal

to the applicable minimum wage when that total amount is divided by the number of hours worked. *See* 29 C.F.R. 778.114(a), (c); *Aiken v. County of Hampton,* 977 F.Supp. 390, 398 n. 9 (D.S.C.1997); *cf.* 29 C.F.R. §§ 778.500–.03 (discussing pseudo-bonuses and devices to evade the overtime requirement).

**22.** That the fluctuating workweek method remains available if the employer limits either the employee's hours or the amount of overtime to which the calculus applies indicates that the fluctuating workweek method remains available if the employer boosts salary permanently in response to an emerging pattern of minimum wage violations. *See* Opinion Letter No. 1010.

are computed in such a workweek by multiplying all the hours worked by the applicable minimum wage, and the overtime hours above the applicable overtime standard by half-time."). However, if breaches of the applicable minimum wage become too common, then the employer must cease using the fluctuating workweek method unless it "reach[es] a new understanding with the employee, either to work no hours above the number which would provide at least the applicable minimum wage at all times or to compute on the fluctuating workweek principle only up to the point where the minimum wage would be penetrated if more hours were worked and then compute the overtime compensation for hours above this number at full time and one-half the applicable minimum wage." Opinion Letter No. 1010.

Finally, the employee's salary must be paid even if she works less than a "full schedule of hours" in a week (full schedule criterion).[23] 29 C.F.R. §§ 778.114(c), 778.306(a); *Donovan v. Daylight Dairy Prods., Inc.*, No. 79–0666, 1984 WL 3186, at *2 (D.Mass. Oct.26, 1984), *aff'd*, 779 F.2d 784 (1st Cir.1985). This condition forecloses the employer from providing less than the entire salary for a week or weeks in which it assigns her less than forty hours to offset compensation due for hours over forty worked in another week in the same pay period.[24] *See* 29 C.F.R. §§ 778.114, 778.306(a). It, however, in no way bars "occasional" deductions from salary for "wilful absences or tardiness," so long as the full salary figures in the calculation of the regular rate and the amount of salary remaining after such reductions supports an average hourly rate at least equal to the applicable minimum wage. II *Wage and Hour Division Handbook*, Mar. 24, 1967, § 32b04b [hereinafter *Handbook*].[25]

23. Section 825.206 interacts with the full schedule criterion. It provides that the employee who works less than forty hours in a week because she takes FMLA leave must receive her full salary. *See* 29 C.F.R. § 825.206(b). It, however, also creates an exception to this requirement. Specifically, the employer can withhold salary when FMLA leave results in the employee laboring less than forty hours if it uses the flat salary method to compute compensation for overtime worked during the period when the employee is taking FMLA leave. *See id.; 60 Fed.Reg.* 2204 (1995) ("If an employer chooses to follow this exception from the fluctuating workweek method of overtime payment, it must do so uniformly for all employees paid on a fluctuating workweek basis who take FMLA leave intermittently or on a reduced leave schedule, and may not do so for employees taking leave under circumstances not covered by FMLA.").

24. Interpretative Bulletin No. 4 details the practice of cutting salary for a week or weeks in which less than forty hours is worked to counterbalance compensation for hours over forty worked in another week of the same pay period. *See W & H Man., supra*, at 133–39 (paragraphs 30, 33–52, 53 and 60–68 of Interpretative Bulletin No. 4 (discussing the "time off" and "prepayment" plans)); *id.* at 164 (answer of Wage and Hour Division's General Counsel to question about the "time off" plan). *Compare W & H Man., supra*, at 134, 139 (paragraphs 38 and 65 of Interpretative Bulletin No. 4) (discussing variations of "time off" and "prepayment" plans involving employers who customarily pay full salary regardless of absences during the week due to holidays, vacations, illnesses or other reasons) *with* Opinion Letter No. 479, [Wages–Hours] Lab.L.Rep. (CCH) ¶ 30,997.18 (May 18, 1966) (prohibiting employers using the fluctuat-

ing workweek method from making certain kinds of salary deductions). *See generally* 2A Singer, *supra* § 51.04. (The portion of Interpretative Bulletin No. 4 addressing this matter was issued in July, 1940. *See W & H Man., supra*, at 127.) The last sentence of Section 778.114(c), as well as Section 778.306(a) of Title 29 to the C.F.R., apparently refers to this compensatory stratagem. *See* 29 C.F.R. §§ 778.114(c) ("where all the facts indicate that an employee is being paid for his [or her] overtime at a rate no greater than that which he [or she] receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek formula"), 778.306(a) (discussing salary reductions in short workweeks).

25. The *Handbook's* sanctioning of occasional salary deductions for tardiness or willful absences, requirement that those deductions in no way affect determination of the regular rate and demand that those deductions not result in the amount of salary actually paid being unable to sustain an average hourly rate at least equal to the applicable minimum wage all accord with Section 778.307. *Compare II Handbook, supra with* 29 C.F.R. § 778.307.

Since the *Handbook* provides no indication to the contrary, it presumably assigns "occasional" a plain meaning: infrequent or irregular intervals. *See Random House Unabridged Dictionary* 1339 (2d ed.1993) [hereinafter *Random House*] (def. 1: "occasional" means "occurring or appearing at irregular or infrequent intervals; occurring now and then ..."); *Webster's Third International Dictionary* 1560 (1967) [hereinafter *Webster's*] (def. 4: "occasional" means "met with, appearing, or occurring irregularly or according to no fixed or certain scheme: infre-

The employee alleging an improper application of the fluctuating workweek method bears the burden of proof.[26] *See Reed*, 1995 WL 684882, at *1; *Fight*, 533 F.Supp. at 1002; *see also Anderson*, 328 U.S. at 687, 66 S.Ct. at 1192, 90 L.Ed. at 1522. *But see, e.g., Monahan*, 95 F.3d at 1281 (placing the burden of proof on the employer as to the clear understanding criterion). Liability arises if the employer either miscomputes overtime pay[27] or uses the fluctuating workweek method despite the absence of one or more of the criteria for doing so.

The nature of compensatory damages due the employee proving a misuse of the fluctuating workweek method depends upon the character of the error:

• *Employer made a computational mistake.* Damages equal to the difference between the amount resulting from the correct calculation of overtime compensation using the fluctuating workweek method and the amount of overtime compensation actually paid. *See Mayhew*, 125 F.3d at 219; *Yadav v. Coleman Oldsmobile, Inc.*, 538 F.2d 1206, 1207–08 (5th Cir.1976).

• *Employer violated the clear understanding criterion, full schedule criterion or both.* Damages equal the difference between the amount of overtime compensation owed when total remuneration is divided by forty, the result is multiplied by 1.5, and that product is multiplied by the number of hours over forty worked and the amount of overtime compensation actually paid[28] as to each week in which the fluctuating workweek method was used.[29] *See Spires v. Ben Hill County*, 745 F.Supp. 690, 709 (N.D.Ga.1990), *aff'd*, 980 F.2d 683 (11th Cir.1993).

• *Employer regularly violated the minimum wage criterion.* Damages equal difference between the amount of overtime compensation owed when total remuneration is divided by forty, the result is multiplied by 1.5, and that product is multiplied by the number of hours over forty worked and the amount of overtime compensation actually paid[30] as to each week in which the fluctuating workweek method was used.[31] *See* Opinion Letter No. 945.

• *Employer infrequently violated the minimum wage criterion and made no effort to cure its breaches.* Damages equal the sum of (1) the amount sufficient to generate an average hourly rate equal to the applicable minimum wage when that amount is added to salary and the result is

quent"). Likewise, it presumably assigns "wilful" a plain meaning: deliberate or intentional. *See Random House, supra*, at 2175 (def. 1: "willful" means "deliberate, voluntary, or intentional"); *Webster's, supra*, at 2617 (def. 2: "willful" means "done deliberately: not accidental or without purpose: INTERNATIONAL SELF-DETERMINED").

26. Since the fluctuating workweek method represents neither an exception nor an exemption to the overtime requirement, the employee must bear the burden of proof. *See* 29 C.F.R. §§ 778.2, 778.109; *Friedrich v. U.S. Computer Sys., Inc.*, CIV.A. No. 90–1615, 1990 WL 124967, at *1–2 (E.D.Pa. Aug.23, 1990) (providing computations to show how the fluctuating workweek method meets the overtime requirement). *But see, e.g., Monahan*, 95 F.3d at 1281.

27. Computational errors in the fluctuating workweek context include neglecting to add bonuses to salary before adducing the regular rate, *see* 29 C.F.R. § 778.114(a), or omitting compensable hours of work, *see Mayhew*, 125 F.3d at 218.

28. Dividing total remuneration by the total number of hours worked and multiplying that result by 1.5 fails constitutes an inappropriate measure of what the employer should have paid because of the fluctuating workweek method's unavaila-

bility because that set of operations leads to the overtime rate equaling two-and-a-half times the regular rate. *Cf.* 29 C.F.R. § 778.114(a).

29. When the employer has violated the full schedule criterion by making more than occasional deductions from salary, compensatory damages include no repayment of those deductions. The employer simply must provide a remedy that brings its method of paying overtime into line with its practice of reducing salary regularly. *Cf.* II *Handbook, supra*.

30. Dividing total remuneration by the total number of hours worked and multiplying that result by 1.5 fails constitutes an inappropriate measure of what the employer should have paid because of the fluctuating workweek method's unavailability because that set of operations leads to the overtime rate equaling two-and-a-half times the regular rate. *Cf.* 29 C.F.R. § 778.114(a).

31. When the employer has regularly committed minimum wage violations, compensatory damages encompass no repayment for those breaches. The employer simply must afford a remedy that places the employee in the position of a salaried worker not paid under the fluctuating workweek method. *Cf.* Opinion Letter No. 945.

divided by the number of hours worked as to each week in which a violation occurred and (2) the difference between overtime compensation due under the fluctuating workweek method when the applicable minimum wage and the total number of hours worked serve as the salary figure and the amount of overtime compensation actually paid as to each week in which a violation occurred. *See id.*

● *Employer infrequently violated the minimum wage criterion and failed to cure its breaches fully.* Damages equal the difference between the amount due under the fluctuating workweek method when the applicable minimum wage and total number of hours worked serve as the salary figure and the amount actually paid. *See id.*

### FLSA Collective Actions

 The FLSA "provides that one or more representative plaintiffs can pursue a collective action alleging violations of [its] . . . provisions." *Crain v. Helmerich and Payne Int'l Drilling Co.*, Civ.A. No. 92–0043, 1992 WL 91946, at *1 (E.D.La. Apr.16, 1992) (citing 29 U.S.C. § 216(b)). To maintain a collective action, "the named representatives and the members of the prospective [collective action] . . . must be similarly situated, and . . . the action must be one of general effect, not one which is purely personal to the [individual] plaintiff[s]." [32] *Wyatt v. Pride Offshore*, Civ.A. No. 96–1998, 1996 WL 509654, at *2 (E.D.La. Sept.6, 1996) (numbering omitted). A showing "that there are other employees of the . . . employer who desire to 'opt in' " also must be made before a case can proceed as a FLSA collective action. *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567–68 (11th Cir.1991).

### Statute of Limitations

 The FLSA establishes a two-year statute of limitations for violations of its provisions. 29 U.S.C. § 255. However, if the employee can establish that the employer willfully breached the FLSA, then she can bring a claim up to three years after the transgression. *See Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir.1990). "Willfulness is a fact issue for the jury." *Karr v. City of Beaumont, Tex.*, 950 F.Supp. 1317, 1325 (E.D.Tex.1997) (citing *Fowler v. Land Management Groupe, Inc.*, 978 F.2d 158, 162–63 (4th Cir.1992)); *see Bankston v. State*, 60 F.3d 1249, 1253 (7th Cir.1995). A willful violation arises when the "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]. . . ." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115, 122 (1988). "Simply failing to seek legal advice concerning [a] . . . pay practice does not evidence a willful violation. . . . Nor is a negligent violation . . . a willful violation." *Mireles v. Frio Foods*, 899 F.2d 1407, 1416 (5th Cir.1990).

When the statute of limitations stops depends upon the type of FLSA suit. The employee seeking relief just for herself tolls the statute by filing a complaint. 29 U.S.C. § 255(a). When a collective action is instituted, the limitations period for the employee continues to run until she consents in writing to becoming a party plaintiff. *See* 29 U.S.C. § 256; *Atkins v. General Motors Corp.*, 701 F.2d 1124, 1130 n. 5 (5th Cir.1983); *see also Perella v. Colonial Transit, Inc.*, 148 F.R.D. 147, 149 (W.D.Pa.1991), *aff'd*, 977 F.2d 569 (3d Cir.), *cert. denied*, 507 U.S. 917, 113 S.Ct. 1275, 122 L.Ed.2d 669 (1993).

 An exception to statutes of limitations, known as the continuing violations doctrine, applies to claims brought under the FLSA. *See McConnell v. Thomson Newspapers, Inc.*, 802 F.Supp. 1484, 1493 (E.D.Tex. 1992); *see also Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050 (5th Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973). *See generally Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989). It is triggered when either "the original violation occurred outside the statute of limitations, but is closely related to

---

**32.** A FLSA collective action differs from a class action brought under Federal Rule of Civil Procedure 23. Specifically, unlike the Rule 23 scenario, plaintiffs to a FLSA collective action must give written consent to participate in the case (i.e., "opt in" to the lawsuit). *See Donovan v. University of Tex. at El Paso*, 643 F.2d 1201, 1206–08 (5th Cir.1981); *LaChapelle v. Owens–Illinois, Inc.*, 513 F.2d 286, 288–89 (5th Cir. 1975).

other violations that are not time-barred ... [or] an initial violation, outside the statute of limitations, is repeated later." *Hendrix v. City of Yazoo City, Miss.*, 911 F.2d 1102, 1103 (5th Cir.1990). In the former situation, "recovery may be had for all violations, on the theory that they are all part of one, continuing violation." *Id.* In the latter one, "each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitations." *Id.*

### Liquidated Damages—Overtime Requirement Violation

■■■ The employer breaching the overtime requirement is liable to affected employees for "unpaid overtime compensation.... and ... an additional equal amount as liquidated damages."[33] 29 U.S.C. § 216(b). "The duty to award liquidated damages in an amount equal to the unpaid [overtime] wages due ... [is] ministerial, not discretionary." *Mireles*, 899 F.2d at 1414; *see Reich*, 8 F.3d at 1030. So "[a] finding that the employer did not act willfully does not preclude an award of liquidated damages." *Cox*, 919 F.2d at 357.

■■■ A court may reduce the amount of liquidated damages flowing from a violation of the overtime requirement "only if the *employer* shows .... that the act or omission giving rise to [the breach] ... was in good faith *and* that [it] ... had reasonable grounds for believing that [its] ... act or omission was not a violation. The employer has a *substantial burden* of proving [its] ... good faith." *Vega v. Gasper*, 36 F.3d 417, 427 (5th Cir.1994). Indeed, even when the employer's actions or omissions were in good faith and based on reasonable grounds, a

court still may award liquidated damages.[34] *Lee v. Coahoma County, Miss.*, 937 F.2d 220, 227 (5th Cir.1991); *Castillo v. Givens*, 704 F.2d 181, 183 n. 1 (5th Cir.), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983).

■■■ The "employer cannot satisfy its dual burden [of showing good faith and reasonable grounds] ... solely by suggesting that lower-level employees are responsible for the violations, or by professing ignorance of the requirements of the [FLSA].... " *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1263 (5th Cir.1986); *see also Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir.1979) ("Apathetic ignorance is never the basis for a reasonable belief."). It has "some duty to investigate potential liability under the [FLSA].... " *Barcellona*, 597 F.2d at 469. "[W]hen [it] ... 'knows or has reason to know that [its] ... conduct is *governed* by the FLSA,' " it cannot secure a reduction in liquidated damages. *Reeves*, 616 F.2d at 1353.

### FACTUAL BACKGROUND

#### Coefficient Employee Compensation

Conn Appliances, Inc., operates Conn Credit Corporation, Conn Rental, Inc., Appliance Parts & Service, Conn Development Corporation and Merchants Acceptance Corporation as subsidiaries.[35] *See* Badon Aff. ¶ 5; Defs.' Reply to Pls.' Resp. to Defs.' Mot. for Summ.J. [hereinafter Reply] (Attach. (Video Dep. of Kellye Badon at 73–74, 87, 90–91 [hereinafter Badon Dep.])). In 1978, Conn decided to use the fluctuating workweek method to determine the overtime pay of some of its employees.[36] *See* Badon Aff.

---

33. " 'As used in the FLSA, liquidated damages is something of a misnomer. It is not a sum certain, determined in advance as a means of liquidating damages that might be incurred in the future. It is an award of special or exemplary damages added to the normal damages .' " *Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018, 1030 (5th Cir.1993) (some internal quotations omitted).

34. A finding of good faith forecloses a determination that the employer's breach of the overtime requirement was willful. *See Blackmon*, 835 F.2d at 1138.

35. For the remainder of this memorandum opinion, the court refers to Conn Appliances, Inc., Conn Credit Corporation, Conn Rental, Inc., Appliance Parts & Service, Conn Development Corporation and Merchants Acceptance Corporation collectively as "Conn."

36. Conn designated persons whose overtime compensation it chose to calculate using the fluctuating workweek method as "coefficient employees." *See* Badon Aff. ¶ 4; *cf.* Badon Dep. at 8 (stating that coefficient employees "are paid a form of overtime called coefficient"). It had about 340 coefficient employees in June, 1997. *See* Badon Dep. at 103–04.

¶¶ 4–5. It did so on the suggestion of Mike Michaelovich, a DOL investigator. *See* Badon Aff. ¶¶ 4–6; Badon Dep. at 67–68. At that time, Michaelovich explained the fluctuating workweek method to Conn's Chief Executive Officer, Tommy Frank. *See* Badon Aff. ¶ 5; *see also* Badon Dep. at 24. He stated that a worker compensated in accordance with that calculus could not suffer a reduction in pay because of short workweek (i.e., a week in which less than forty hours of work was assigned), but could have pay withheld because of an absence from work due to illness that sick leave was insufficient to cover or because of personal business. Badon Aff. ¶ 5; *see* Badon Aff. Attach. 1.

Conn's compensation scheme for coefficient employees entailed several practices.[37]

First, each coefficient employee received a monthly salary, regardless of how many hours he or she was scheduled to work.[38] Badon Dep. at 8–11, 37. However, failure to work assigned time, whether because of tardiness, a need to conduct personal business, or illness for which no sick leave was available, sometimes resulted in the loss of a portion of a day's pay (docking policy).[39] *See* Badon Dep. at 31–32, 36–40; *see also* Badon Aff. ¶¶ 10–11 & Attach. 1; Defs.' Am.Ans. to Pls.' First Am.Compl. at 3 [hereinafter Ans.]; Badon Dep. at 56. Second, Conn omitted bonus and incentive payments from its regular rate computations. *See* Ans. at 5; Badon Dep. at 78–79. Finally, when a coefficient employee worked so many hours that his or her regular rate dropped below the applica-

37. All plaintiffs worked as coefficient employees for Conn. *See* Badon Aff. ¶¶ 7–11. *Compare* Defs.' Ex. 1 (admitted during hearing on motion for summary judgment) *with* Badon Dep. at 71–73, 87–89. Cash was employed between April 5, 1993, and March 5, 1996. Prater was employed between April 22, 1993, and June 17, 1994. Stroder was employed between October 21, 1991, and July 21, 1995. Malbrough was employed between November 5, 1991, and November 15, 1994. Harrington was employed between April 7, 1994, and July 20, 1995. Johnson was employed between January 23, 1995, and April 30, 1996. Lucia was employed between December 8, 1993, and June 1, 1996. Neatherly was employed between December 15, 1986, and November 18, 1994. Chambers was employed between September 12, 1989, and October 11, 1994. Def.'s Ex. 1. (Although Cash also worked for Conn between 1980 and 1986, *see* Def.'s Ex. 1, her claim in this case relates only to her tenure between 1993 and 1996, *see* Pls.' First Am.Compl. at 2.)

38. Coefficient employee weekly salary was determined by multiplying monthly salary by twelve and dividing the result by fifty-two. *Compare* Badon Aff. Attach. 1 *with* 29 C.F.R. § 778.113(b).

39. Between May 29, 1994, and June 30, 1996, Cash, Stroder, Malbrough, Johnson and Lucia each lost salary under the docking policy. *See* Badon Aff. ¶¶ 10–11. Cash lost salary in 4 of the 92 weeks she was employed by Conn during that period (i.e., weeks covering May 29, 1994, to March 5, 1996). Stroder lost salary in 7 of the 60 weeks she was employed by Conn during that period (i.e., weeks covering May 29, 1994, to July 21, 1995). Malbrough lost salary in 6 of the 24 weeks she was employed by Conn during that period (i.e., weeks covering May 29, 1994, to November 15, 1994). Johnson lost salary in 1 of the 67 weeks she was employed by Conn during that period (i.e., weeks covering January 23,

1995, to April 30, 1996). Lucia lost salary in 2 of the 105 weeks he was employed by Conn during that period (i.e., weeks covering May 29, 1994, to June 1, 1996). *Compare* Written Mem. of Information in Resp. to the Ct.'s Order of Sept. 7, 1997, at 3–4 [hereinafter Mem.] (recording when Cash, Stroder, Malbrough, Johnson and Lucia, respectively, were docked salary) *with* Summ.J. Hr'g Tr. at 59 (Conn stipulates to the accuracy of salary deductions reported on pages 3 and 4 of plaintiffs' Written Memorandum of Information in Response to the Court's Order of September 7, 1997). The deductions occurred in irregular intervals of time as to all five of these persons. *See* Mem. at 4–5. (The court used the perpetual calendar to determine the number of weeks that Cash, Stroder, Malbrough, Johnson and Lucia each worked for Conn between May 29, 1994, and June 30, 1996. *See The World Almanac and Book of Facts 1994*, at 264–65 (1993).)

Besides the salary losses suffered by Cash, Stroder, Malbrough, Johnson and Lucia, the summary judgment record includes a ten-and-a-half page list of instances in which a coefficient employee lost weekly salary under the docking policy. *See* Mem.Ex. A. Neither that list nor anything else discloses either the period of time that the list covers, the total number of coefficient employee salaries paid during the period the list encompasses or the salary of each person appearing on the list. *See* Mem. at 4–5 & Ex. A.

Finally, nothing in the summary judgment suggests that an amount less than full salary ever provided the baseline for figuring overtime due for a week in which the employee lost pay under the docking policy but still worked over forty hours. Nor does the summary judgment record include any instance in which reductions yielded a weekly salary too low to sustain an average hourly rate at least equal to the applicable minimum wage. *See* Resp.; Mem.

ble minimum wage, Conn provided him or her with (1) extra pay sufficient to generate a regular rate equal to the applicable minimum wage when that amount was added to salary and the result was divided by the number of hours worked and (2) the difference between the amount of overtime compensation yielded under the fluctuating workweek method when the product of the applicable minimum wage and total number of hours worked served as the salary figure and the amount of overtime compensation actually paid.[40] *See* Badon Dep. at 65–67; *see also* Badon Dep. at 48, 49, 94, 130–31.

Conn developed a written example of its method of compensating coefficient employees. *See* Badon Aff. ¶ 6. This document explained how to determine the total pay due someone earning $200 in weekly salary in each of two weeks. Badon Aff. Attach. 1. The salary figure remained the same in both weeks, but the number of hours worked over forty varied. *See* Badon Aff. Attach. 1. The following statement appeared after the two calculations: "Do not dock individuals on coefficient *if scheduled short*. If the individual takes off on personal business or is ill and has not accumulated enough sick time, you may· dock—per Mr. Michaelovich at Wage and Hour." Badon Aff. Attach 1. A facsimile of the DOL's coefficient table was attached to the written example. Badon Aff. ¶ 6 & Attach. 1; Badon Dep. at 17. *Compare* Badon Aff. Attach. 1 *with* Coefficient Table. Beginning in 1978, Conn gave a copy of the written example and coefficient table to all coefficient employees. *See* Badon Aff. ¶ 6.

Each new coefficient employee was given the written example, the coefficient table and an oral description from a member of Conn's Personnel Department of how his or her compensation was calculated beginning in 1989.[41] *Compare* Badon Aff. ¶ 7 *with* Badon Dep. at 11, 15–16, 21–24. When Conn's Human Resource Director, Kellye Badon, provided the oral explanation, which was usually the case, *see* Badon Dep. at 11, 15–16, 21–24, she said something like the following:

**40.** In three weeks during the summer of 1994, Harrington's regular rate fell below the applicable minimum wage, which was $4.25 per hour, 29 U.S.C. § 206(a) (1994) (superseded). *See* Joint Stipulation of Parties in Resp. to the Ct.'s Order of Sept. 29, 1997 (Aff. of Kellye Badon ¶ 6 & Ex. 1 (Harrington's pay record) [hereinafter Badon Aff. II]). (During none of these weeks did he receive bonuses or incentives; so his regular rate and ·average hourly rate was the same in each of·them. *See* Badon Aff. II Ex. 1.) For the week of June 26, his salary yielded a regular rate $0.57 under the minimum wage. *See* Badon Aff. II ¶ 6. For the week of July 24, his salary yielded a regular rate $0.23 under the minimum wage. *See* Badon Aff. II ¶ 6. For the week of August 7, his salary yielded a regular rate $0.22 under the minimum wage. *See* Badon Aff. II ¶ 6.

Conn took two actions in response to the minimum wage violations involving Harrington. First, during August and September, 1994, it gave him extra compensation totaling $160.00, which it considered enough to cover the amount of pay due to him. *See* Badon Aff. II ¶¶ 7–8. Second, in late August, 1994, it raised his salary to preclude his regular rate from again dipping below the minimum wage. Badon Aff. II ¶ 9. (Harrington's salary never again was unable to sustain an average hourly rate at least equal to the applicable minimum wage. *See* Badon Aff. II Ex. 1.)

Besides those concerning Harrington, the summary judgment record includes the following materials relating to Conn's minimum wage violations: (1) a set of reports on the amount of overtime worked by some coefficient employees during April and May, 1994, *see* Resp. at 11 n. 6, 26–27 (citing Exhibit G), (2) a minimum wage violation arising as a result of a coefficient employee working 90.25 hours in a week, *see* Resp. at 11 n. 4 (citing Exhibit F); *see also* Badon Dep. at 65–67, and (3) a list of slightly more than eight pages reciting the coefficient employees to whom Conn allegedly owes overtime compensation, *see* Resp. at 11 n. 6, 26–27 (citing Exhibit I); *see also* Mem. at 5–6 (citing Exhibit B). The set of reports appear in no particular order. *See* Resp. Ex. G; *cf.* Resp. at 11 n. 6 (just detailing what certain handwritten notations on the reports mean). In her deposition, Badon characterized the week in which a minimum wage breach occurred because a coefficient employee labored 90.25 hours as infrequent event. *See* Badon Dep. at 66. As for the list, which covers January 1, 1994, to June 30, 1996, *see* Resp. at 11 n. 6, 27; Mem. at 5–6, it just gives the total amount of overtime and total amount of overtime compensation owed to each person on it. *See* Resp.Ex. I. Plaintiffs seem to argue that the sheer size of the overtime totals for some persons, alone, raise a reasonable inference of numerous minimum wage breaches. *See* Resp. at 26–27.

**41.** All plaintiffs except Neatherly, who was hired before 1989, *see* Defs.' Ex. 1, received the written example, the coefficient table and an oral description of the manner in which their pay was figured at the outset of their employment with Conn. *Compare* Badon Aff. ¶ 7 *with* Badon Dep. at 11, 23.

... The manner in which we are offering you a salary of $1500 a month.... So, you're going to make $1500 a month, which is actually $18,000 a year. You're going to earn that salary for the hours that you—that you work, regardless of the number that you work. It's a—it's a monthly salary.

Now, let me show you how we're going to calculate anything—in compliance with F.L.S.A., how we're going to calculate the hours that we have to pay you for over 40. The way you do it is: We've got $15,000–a–month [sic] salary that is guaranteed to you.

. . . .

1500 a month times 12 months in a year equals $18,000 a year in annual salary that you are going to earn. Now, in order for us to calculate what we will pay you for over 40 hours, we need to derive a weekly salary. So I'm going to take the 18,000 and divide by 52 weeks in the year; and you're going to have a weekly salary of $346.15.

Now, you'll earn this weekly salary for weeks that you work 40 hours, weeks that you work 50 hours. You have a guarantee every week.

Now, we need to calculate and pay you a form of overtime. So, we're going to look at—here's the coefficient chart from the Department of Labor, and let's say in one week that you work 45 hours. I'm going to take your weekly salary of 346.15 and come here to the chart that D.O.L. has provided and look at 45 hours; and we have a decimal here of .056. So, I multiply your weekly salary times .056; and that equals $19.38 that you will be compensated for the hours over 40 in that particular week.

Now, let's say you work a 50–hour week.... I'm going to go here to the 50 hours and take your weekly salary of 346.15 times this decimal (indicating) and we'll take 346.15 times .100 and that equals 34.61 in

extra compensation that you are going to earn in that week for working 50 hours a week.

So, you can see, as long as you know the weekly salary that is guaranteed to you, based on the time records you turn in to our office, we—you can always calculate what you're going to earn by using this chart and determining the number of hours that you worked in that week, for purposes of calculating coefficient, multiply your weekly salary times that appropriate decimal.

Now, in the event that we do not schedule you for 40 hours or for a full week, we are going to compensate you your weekly salary; and so, you will have a guarantee because sometimes you will have a fluctuating work schedule, depending on the work needs.

Badon Dep. at 18–20. After the oral explication of the coefficient employee pay system, the new hire signed the following form:

### UNDERSTANDING MY METHOD OF COMPENSATION

IT IS IMPORTANT THAT EACH EMPLOYEE KNOW AND UNDERSTAND HIS/HER METHOD OF COMPENSATION.

PLEASE DISCUSS ANYTHING YOU FAIL TO UNDERSTAND WITH YOUR MANAGER AND/OR A MEMBER OF THE PERSONNEL DEPARTMENT.

MY METHOD OF COMPENSATION HAS BEEN EXPLAINED TO ME, AND I UNDERSTAND IT.

_____
NAME

_____
DATE

Badon Aff. Attach. 2 (changes to format made); *see* Badon Dep. at 20.

On July 5, 1996, Robert Foster, a DOL investigator, told Badon that Conn's docking policy violated the FLSA.[42] *See* Badon Aff.

---

**42.** Foster learned about the docking policy when a coefficient employee named Brenda Taylor complained to the DOL about it. Badon Dep. at 55–56. Prior to that time, he had identified denial of an entire day's pay as a permissible monetary sanction to impose on coefficient employees in Conn's Houston, Texas, delivery department for failing to work assigned times. *See*

Badon Dep. at 27–28. Conn had responded to this opinion by instituting a policy under which $60.00 was withheld whenever someone in the Houston delivery department missed work without justification, while $60.00 was paid to the person who substituted for the derelict. *See* Badon Dep. at 28–31.

¶ 13; Badon Dep. at 33–34, 56; *see also* Badon Dep. at 52, 159–60. In response to Foster's comment, Conn ended the docking policy and audited the coefficient employee payroll for the period running from January 1, 1994, to July 31, 1996. *See* Badon Aff. ¶¶ 13–14; Badon Dep. at 52, 56, 79–80, 98–99. In September or October, 1996, it reached several determinations regarding coefficient employee compensation after completing the audit. *See* Badon Aff. ¶ 14. First, it decided to award compensation previously withheld pursuant to the docking policy. *See* Badon Aff. ¶ 14; Badon Dep. at 34, 82, 107, 108–09. Second, despite already having done so, it decided to correct each minimum wage breach by giving the affected coefficient employee additional compensation sufficient to generate an average hourly rate equal to the applicable minimum wage when the amount was added to salary and incentives and the result was divided by the number of hours worked. *See* Badon Dep. at 97–98, 107, 108, 110. Third, it decided to pay the difference between overtime compensation based on a regular rate incorporating incentives and bonuses and the amount of overtime compensation actually paid. *See* Badon Dep. at 108; *cf.* Ans. at 5. Finally, it decided to add to each reimbursement a payment equal to 10 percent of the amount owed. Badon Aff. ¶ 14.

### *Procedural History*

Plaintiffs brought this FLSA suit in state court on June 7, 1996. Notice of Removal ((Pls.' Original Pet. at 1, 3) (state court docket sheet)). In their original petition, they pled a collective action. Notice of Removal (Original Pet. at 3).

Defendants removed this case to federal court on July 10, 1996. Notice of Removal at 1. Following that event, plaintiffs filed an amended complaint, in which they requested permission to bring a FLSA collective action on behalf of the following group:

> All current and former employees of Defendants in the previous three (3) years (excluding managers, executives, bona fide administrative employees, or others who were exempt from the overtime provisions of the FLSA during the relevant time period), who were to be paid for time worked over forty (40) hours in a workweek on a

"co-efficient" basis pursuant to a "Co-efficient" Chart (the "Chart"), and/or who were offered "bonuses" or other compensation in lieu of overtime. . . .

Pls.' First Am.Compl. at 5.

On December 11, 1996, the court entered a docket control order limiting discovery to culling for "information for the past three (3) years regarding the identity (including last known address and phone numbers) of [prospective plaintiffs] . . .; their rate(s) of pay; the method in which they were paid; the amount they received weekly or monthly; and other information Plaintiffs believe relevant to determining the nature of the [collective action]" and ordered Conn to file a brief on the propriety of permitting this case to proceed as a collective action (collective action question) by January 10, 1997. Docket Control Order, entered Dec. 11, 1996, at 2.

On January 10, 1997, Conn submitted a motion for summary judgment on plaintiffs' individual claims instead of a brief on the collective action question. *See* Modified Docket Control Order, entered Feb. 13, 1997, at 1 [hereinafter Docket Control Order II]; Mot. at 2 (claiming that the meritorious nature of the summary judgment motion "mak[es] it unnecessary to consider further plaintiffs' efforts to broaden this case into a class action"). In light of this development, the court authorized plaintiffs to file a response to the summary judgment motion and a brief on the collective action question. *See* Docket Control Order II at 2.

Plaintiffs filed their response and brief on July 15, 1997. Resp. at 1; Br. in Supp. of Class Certification [hereinafter Br.] (cover sheet). In their brief, they asked for this case to proceed as a FLSA collective action encompassing the following persons:

> All current and former employees of Defendants (excluding managers, executives, bona fide administrative employees, or others who were exempt from the overtime provisions of the FLSA during the relevant time period), who were to be paid for time worked over forty (40) hours in a workweek on a "co-efficient" basis pursuant to a "Co–Efficient" Chart (the "Chart").

Br. at 13. They refrained from requesting that the group be divided into subcategories. Br. at 13 n. 7.

Conn's summary judgment motion and plaintiffs' request for this case to proceed as a collective action question largely mirrored each other. Both focused on the question of whether Conn should have used the fluctuating workweek method to figure coefficient employee overtime compensation.[43] *See, e.g.,* Mot. at 2 ("the named plaintiffs were paid consistent with the provisions of 29 C.F.R. § 778.114"); Br. at 23 ("The central issue is whether the defendants' 'coefficient' method of paying certain nonexempt employees was across the board improper and a violation of the FLSA.").

After reviewing all of the materials relating to the summary judgment motion and the collective action question, the court determined that resolution of the former should precede a decision on the latter. *See* Scheduling Order (Aug. 15—Oct.15, 1997), entered Aug. 18, 1997, at 1.

### DISCUSSION

Plaintiffs charge Conn with failing to pay them enough for overtime because of two errors. First, they contend that Conn omitted a necessary input, incentives, from its regular rate computations. *See* First Am. Compl. at 9. Second, they assert that Conn's reliance on the fluctuating workweek method to figure their overtime compensation was misplaced. *See* First Am.Compl. at 9–10.

Conn concedes as inappropriate its exclusion of incentives from its regular rate calculations. *See* Ans. at 5. It, however, disputes the claim that it wrongly used the fluctuating workweek method. *See* Ans. at 5–6.

### *Availability of Fluctuating Workweek Method*

Conn maintains in its summary judgment motion that its use of the fluctuating workweek method to determine plaintiffs' overtime compensation constituted no FLSA violation. *Compare Howell Hydrocarbons, Inc. v. Adams,* 897 F.2d 183, 191 (5th Cir.1990) *with* Mot. at 6–10, 11 *and* Reply at 5–10. Plaintiffs disagree. According to them, Conn met none of the criterion for employing that calculus. *See* Resp. at 19–28; *see also* Mem. at 5. Conn's position proves persuasive.

### *Full Schedule Criterion*

Conn maintains that its manner of compensating coefficient employees satisfied the full schedule criterion. *See* Mot. at 7–8; Reply at 4–5. Plaintiffs point to the docking policy as defeating that claim.[44] *See* Resp. at 22–24, 26. Specifically, they observe that Section 778.114, the rule describing the fluctuating workweek method, covers only workers employed on a "salary basis." The absence of a definition of "salary basis" in this rule prompts them to argue that the meaning of that phrase is found in Section 541.118(a), the second part of the salary-basis test for the white collar exemption. Since Section 541.118(a) bars employers from making employees subject to the kinds of salary deductions Conn imposed, they assert that the fluctuating workweek method was unavailable to their ex-employer.[45] *See* Resp. at 22–

**43.** Both sides only discussed Conn's attempts to remedy minimum wage violations as to the question of whether or not those efforts supported its use of the fluctuating workweek method. *See, e.g.,* Resp. at 23 (arguing that Conn had to "mak[e] sure that [coefficient employee] ... pay *never* fell below minimum wage" to qualify for the fluctuating workweek method (emphasis added)); Reply at 13 (asserting that a minimum wage violation fails to invalidate use of the fluctuating workweek method); Br. at 27 ("The Company believes that it is entitled to work its [coefficient] employees as hard as it wants, and then retroactively reimburse those employees if their total compensation (i.e., 'guaranteed salary') reduces them to working for less than minimum wage. This is simply not the law nor is it the intent behind ... 29 C.F.R. § 778.114."). In the summary judgment context, neither one addressed the effect, *per se,* of Conn's failure to

calculations. *See* Resp. at 15; Reply at 9. However, plaintiffs' brief on the collective action question identified the issue of "[w]hether 'bonuses' and other remuneration should be included in [coefficient] employees' regular rate of pay for purposes of calculating overtime" as one common to all persons who would join a collective action. Br. at 22. *Compare* Pls.' First Am. Compl. at 6 *with* Ans. at 5.

**44.** Plaintiffs neither make allegations nor present evidence that any coefficient employee ever lost salary under the docking policy because of being away from work on FMLA leave. *See, e.g.,* Pls.' First Am.Compl. at 10; Resp. at 22–24, 26; *cf.* Mem. at 13–14.

**45.** Plaintiffs' belief that a relationship exists between Sections 541.118(a) and 778.114 presum-

24, 26 & n. 8; Mem. at 12–13.

■ Plaintiffs' contention regarding how Section 778.114 employs "salary basis" focuses attention on the following issue: to which contexts Section 541.118(a) does apply? A review of materials and principles relevant to that query leads to a finding that their interpretive argument lacks merit.

Section 541.118(a)'s language proves inconclusive as to where the rule's conception of "salary basis" applies. While Section 541.118(a) states that it describes "salary basis . . . within the meaning of the regulations," 29 C.F.R. § 541.118(a) (internal quotation omitted), it gives no clue as to whether or not that pronouncement refers to all rules concerning the FLSA or just those regarding the white collar exemption. *See id. But cf. Whitmore v. Port Auth. of N.Y. & N.J.*, 907 F.2d 20, 22 (2d Cir.1990) (Pierce, J., dissenting); *Aiken*, 977 F.Supp. at 395; *Black v. Comdial Corp.*, Civ.A. No. 92–081–C, 1994 WL 70113, at *5 (W.D.Va. Feb.15, 1994).

Section 541.118(a)'s ambiguous text prompts consideration of any pronouncement by the Administrator as to whether that rule reaches Section 778.114. *See Bowles*, 325 U.S. at 417–18, 65 S.Ct. at 1219, 89 L.Ed. at 1704–05. He, however, apparently has never addressed that question.[46] This silence ne-

cessitates resort to other interpretive tools to resolve it. *See* 3 Koch, *supra* § 11.26.

Three aids to understanding all point to the conclusion that Section 541.118(a) presents a definition of "salary basis" inapplicable to Section 778.114. First, the initial formulation of Section 541.118(a), which appeared in 1949, began with the following phrase: "An employee will be considered to be paid on a salary basis within the meaning of *the regulations in Subpart A of this part*," 14 FedReg. 7732 (1949) (emphasis added). *See* 2B Singer, *supra* § 51.04. Because "salary basis" was only mentioned in Subpart A of Part 541 to Title 29 of the C.F.R. (Subpart A) in provisions explicating the first element of the salary-basis test, *see* 14 *Fed.Reg.* 7705–07 (1949), the original version of Section 541.118(a) explicitly restricted its applicability to the white collar exemption.[47] It contemplated playing no role in any other context.

Second, Section 825.206, the recently enacted rule on the FMLA relating to both Sections 541.118(a) and 778.114, recognizes the second part of the salary-basis test as wholly distinct from the fluctuating workweek method. *See* 2B Singer, *supra* § 51.01–.03. It characterizes itself as a "special exception to the 'salary basis' require-

---

rules explaining how to compute overtime compensation explicitly defines "salary basis," *see, e.g.*, 29 C.F.R. §§ 778.109, 778.113, 778.114, and that the Administrator apparently never has explained what that "salary basis" means as to Section 778.114.

**46.** Although the Administrator has never offered an opinion on whether Section 541.118(a) informs Section 778.114's conception of "salary basis," a remark made when he introduced the first element of the salary-basis test in 1940 evinces a general attitude that would seem to logically lead to a rejection of the view that such a relationship exists. On that occasion, he said, "[W]hile it is reasonable to hold that the terms 'bona fide executive, administrative, and professional capacity' are properly applicable in general only to salaried workers, *it does not necessarily follow that all salaried workers fall within these three categories.*" W & H Man., *supra*, at 431–32 (emphasis added); *see also id.* at 442 (defending the choice of $30.00 as the compensatory threshold for qualifying as an executive: "[T]here must be adequate differentiation between the salary normally earned by a worker for a standard workweek who is employed as a craftsman or machine operator or tender and the salary of a

person whose exemption is sought as an executive"). This comment disclosed an understanding of the salary-basis test as a mechanism for distinguishing salaried employees falling within the white collar exemption from other workers who receive salaries. Indeed, as such, it manifested the Administrator's respect for the FLSA's express directive that he just "defin[e] and delimit[ ]" the white collar exemption. *See W & H Man., supra*, at 432 ("the Administrator does not have the power to exempt all salaried workers"); *cf. Walling v. Yeakley*, 140 F.2d 830, 831–32 (10th Cir.1944) ("Congress chose general phrases to describe the exempted classes of employees and delegated to the Administrator the power and duty, by regulation, to define and delimit those classifications by reasonable and rational specific criteria. Necessarily, if the classifications are limited by specific definition and delimitation, some employees who might fall within the general meaning of the phrases employed by Congress will be excluded.").

**47.** Except for a special provision relating to public employees, all mentions of "salary basis" in the current version of Subpart A are in sections concerning the first part of the salary-basis test. *See* 29 C.F.R. pt. 541.

ments of the FLSA [white collar] exemption *or* fluctuating workweek requirements." 29 C.F.R. § 825.206(c) (emphasis added); *see also id.* ("[h]ourly or other deductions which are not in accordance with 29 CFR Part 541 or 29 CFR § 778.114") ("[n]or may deductions which are not permitted by 29 CFR 541 or 29 CFR § 778.118"). This language clearly perceives Sections 541.118(a) and 778.114 as addressing divergent matters. *See Random House, supra,* at 1360 (def. 1: "or" means "used to connect words, phrases or clauses representing alternatives"); *Webster's, supra,* at 1585 (def. 1: "or" means "used as a function word to indicate (1) an alternative between different or unlike things, states, or actions ..."); *see also Quindlen,* 482 F.2d at 878. Section 825.206's structure accords with its text. *See Metropolitan Stevedore,* 515 U.S. at 295, 115 S.Ct. at 2148, 132 L.Ed.2d at 233. Subdivision (a) outlines this rule's relation to Section 541.118(a), while subdivision (b) explains its relation to Section 778.114. *See* 29 C.F.R. § 825.206(a),(b). Section 825.206 represents a further indication that the meaning of "salary basis," as used in Section 778.114, is not found in Section 541.118(a).[48]

Finally, a fundamental interpretive principle argues for reading Section 541.118(a) as failing to inform Section 778.114's use of the phrase "salary basis." Specifically, only that construction averts disharmony between two related rules. *See* 2B Singer, *supra* §§ 51.01–.03. Section 778.307, which covers employees paid overtime according to the fluctuating workweek method, *see supra* note 25, sanctions reductions from salary for tardiness, which Section 541.118(a) proscribes. *Compare* 29 C.F.R. § 778.307 *with id.* § 541.118(a)(2), (5) *andAuer,* 519 U.S. at ——, 117 S.Ct. at 910–11, 137 L.Ed.2d at 89–90 *and Klein,* 990 F.2d at 281, 284–85 *and Lacey,* 810 F.Supp. at 247. If " salary basis," as used in Section 778.114, accords with Section 541.118(a)'s rendition of that concept, then a conflict arises between Sections

778.114 and 778.307, which relate to each other. *See, e.g., Rice,* 13 F.3d at 1568. Avoiding this circumstance supports finding the use of "salary basis" in Section 778.114 as distinct from the definition assigned to that phrase by Section 541.118(a).

Plaintiffs' claim that Section 541.118(a) is engrafted upon Section 778.118 proves unsuccessful. Indeed, pertinent interpretive sources suggest just the opposite of their contention. They establish Section 541.118(a) as a mechanism to separate salaried employees coming within the white collar exemption from salaried employees falling beyond that exclusion, such as those whose overtime compensation is calculated using the fluctuating workweek method. *Compare* 29 C.F.R. §§ 778.2, 778.107 *with McCloskey,* 903 F.Supp. at 562–63 ("In contrast, an employee does lose his exempt status (and therefore must be paid overtime) when his salary is subject to reductions for, *inter alia,* partial-day absences for personal reasons, including lateness, sickness, ... or disciplinary reasons other than penalties imposed in good faith for infractions of safety rules of major significance.").

■■■ The failure of Section 541.118(a) to define Section 778.114's notion of "salary basis" requires that the phrase, as it appears in the latter rule, assume its plain meaning. *See Bowles,* 325 U.S. at 413–14, 65 S.Ct. at 1217, 89 L.Ed. at 1702–03; *Louisiana Debating and Literary Ass'n,* 42 F.3d at 1491. Under that reading, "salary basis" simply characterizes the following: a fixed sum paid at regular intervals of time that serves as the foundation of employee non-overtime pay.[49] *See Random House, supra,* at 174, 1693 (def. 4: "basis" means "a basic fact, amount, standard, etc, used in making computations, reading conclusions or the like: *The nurse is paid on an hourly basis.*") ("salary" means "fixed compensation periodically paid to a person for regular work or services"); *Webster's, supra,* at 182, 2003 (def. 2: "basis"

---

**48.** Section 825.206 indicates that the lack of reference in Section 541.118(a) to Subpart A beginning in 1954, *compare* 14 *Fed.Reg.* 7732 (1949) *and* 29 C.F.R. § 541.118(a) (1954) (superseded) *with* 19 *Fed.Reg.* 4405 (1954), signaled no change the white collar exemption's realm of applicability. (The Administrator never has discussed the effect of this omission, if any.)

**49.** The conception of salary as a "fixed amount" must be qualified by the possibility it may be reduced in certain circumstances. *See In re Locklin,* 101 F.3d at 439; 2B Singer, *supra* § 51.02.

means "the principle component of anything: fundamental ingredient") (def. 1: "salary" means "fixed compensation paid regularly (as by the year, quarter, month or week) for services"). This reading comports with the example of the fluctuating workweek method presented in Section 778.114, which portrays salary as a fixed sum paid every week,[50] *see* 29 C.F.R. § 778.114(b). *See In re Locklin,* 101 F.3d at 439. It also accords with Interpretative Bulletin No. 4, Section 778.114's ancestor, *see* 2B Singer, *supra* § 51.04, which contemplates the compensation of employees by "a *constant wage or salary from pay period to pay period,*" *W & H Man. supra,* at 132 (paragraph 28 of Interpretative Bulletin No. 4).

Resolution of plaintiffs' claim concerning the meaning of "salary basis" still leaves the following issues outstanding: (1) whether or not Conn paid coefficient employees on a "salary basis," which Section 778.114 contemplates, and (2) whether or not the docking policy accords with the full schedule criterion. As to the first matter, Conn complied. It expected to pay coefficient employees a fixed amount at regular intervals of time for their work. Its written example captures this situation.

■■■ As to the second matter, Conn committed no breach. The docking policy only called for a loss of pay for absences during scheduled time; it in no way sanctioned reducing pay because of a failure to assign a coefficient employee forty hours of work for a week.[51] Reductions to coefficient employee pay only occurred occasionally[52] and only

applied to absences associated with willful behavior. All of these circumstances evince observance of, not deviation from, Section 778.114.

## Minimum Wage Criterion

■■■ Conn argues that its minimum wage violations represented no breach of the minimum wage criterion. *See* Mot. at 7; Reply at 6. Plaintiffs counter by pointing to the reports on the amount of overtime worked by some coefficient employees during April and May, 1994, *see* Resp. at 11 n. 6, 26–27 (citing Exhibit G), the minimum wage violation arising as a result of a coefficient employee who labored 90.25 hours in one week, *see* Resp. at 11 n. 6 (citing Exhibit F), and the list of the coefficient employees to whom Conn allegedly owes overtime compensation because of minimum wage breaches, *see* Resp. at 11 n. 6, 26–27 (citing Exhibit I). They consider this proof sufficient to raise a reasonable inference that Conn was foreclosed from relying upon the fluctuating workweek method because of a failure to meet the minimum wage criterion. *See* Resp. at 26–27; *see also* Br. at 2 (accusing Conn of "the frequent practice of forcing employees to work so long that their regular rates of pay actually fell below the minimum wage").

Plaintiffs' evidence generates no fact issue as to whether or not so many minimum wage violations occurred that the fluctuating workweek method was unavailable to Conn. First, the disorganized character of the reports forecloses them from being persuasive. *See, e.g., Zoslaw,* 693 F.2d at 873. Second, the

---

**50.** Although the example in Section 778.114 uses a week for the pay period, a pay period can cover a longer spans of time than that. *See* 29 C.F.R. §§ 778.103, 778.109, 778.113(b).

**51.** As noted earlier, the summary judgment record reveals no case in which full salary was not used as the baseline for figuring overtime due for a week in which the employee lost pay under the docking policy but still worked over forty hours. Nor does it record any instances in which reductions yielded a salary too low to sustain an average hourly rate at least equal to the applicable minimum wage.

**52.** The summary judgment record fails to show more than occasional salary deductions pursuant to the docking policy. First, Cash, Stroder, Malbrough, Johnson and Lucia all suffered deductions on an irregular basis. Second, contrary to what plaintiffs presumably believe, *see, e.g.,*

Resp. at 7 (characterizing the docking policy as "an institutional, ongoing pattern or practice"), the ten-and-half page list of salary deductions made under the docking policy invites nothing more than speculation about whether salary deductions occurred regularly or infrequently because of the summary judgment record's failure to disclose the number of salaries paid to each person on the list, the total number of deductions the list presents, or the total number of coefficient employee salaries paid during the period the list covers, whatever that may be. *See generally Wilkins v. University of Houston,* 654 F.2d 388, 410 (5th Cir. Unit A Aug.1981) ("the day is long past ... when we proceed with any confidence toward broad conclusions from crude and incomplete statistics"), *vacated on other grounds,* 459 U.S. 809, 103 S.Ct. 34, 74 L.Ed.2d 47 (1982).

minimum wage breach precipitated by the coefficient employee who toiled 90.25 hours in a week, by itself, operates as no bar on use of the fluctuating workweek method.[53] *See Aiken,* 977 F.Supp. at 393. Finally, the list of coefficient employees purportedly due overtime because of minimum wage violations is unhelpful because plaintiffs neither identify the persons on the list whose average hourly rate fell under the applicable minimum wage and number of times each of those individuals suffered that fate, disclose the total number of violations that the list covers, nor relate how many coefficient employee salaries were paid during the period the list encompasses. Concluding from the list that regular minimum wage violations occurred without these pieces of information constitutes nothing more than sheer speculation. *Cf.* Opinion Letter No. 1010 (commenting on the propriety of twenty-seven minimum wage violations during a year); Opinion Letter No. 945 (assessing the permissibility of five minimum wage violations in an annual period); *Brennan v. General Motors Acceptance Corp.,* 482 F.2d 825, 829 (5th Cir.1973) (evidence relating to at least 16 of 37 employees sufficient to establish FLSA plaintiff's prima facie case); *Reich v. Brenaman Elec. Serv.,* No. Civ.A. 95–CV–3737, 1997 WL 164235, at *7 (E.D.Pa. Mar.28, 1997) (testimony of 9 of 39 employees sufficient to show a FLSA pattern or practice violation). *See generally Wilkins,* 654 F.2d at 410; *In re Food Lion Effective Scheduling Litig.,* 861 F.Supp. 1263, 1274 (E.D.N.C.1994) (finding no FLSA pattern or practice violation). These evidentiary shortcomings preclude plaintiffs from rebutting Conn's proof that it complied with the minimum wage criterion.

*Clear Understanding Criterion*

■ Conn asserts that it "had a clear understanding with each plaintiff that his or her salary [would] cover[ ] whatever hours were required to get the job done and that he or she would be paid additional half-time for all overtime hours worked per week." Mot. at 6; *see also* Reply at 4. Plaintiffs counter that no such meeting-of-the-minds ever arose because Conn failed to "indicat[e] that: (i) coefficient employees normally would be entitled to time-and-a-half compensation; (ii) [coefficient] employees [would] ... be required such significant hours that their hourly rate [would] fall[ ] below the minimum wage; or (iii) ... all coefficient employees [were] ... subject to its practice or policy of making partial day deductions for missed work, or for disciplinary reasons that are unrelated to major safety considerations." Resp. at 26.

Plaintiffs' complaints about the renditions of the fluctuating workweek method that they received ignore that the employee need only possess a clear understanding "that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number," 29 C.F.R. § 778.114(a); *see also id.* § 778.114(c). Nothing obligated Conn either to disclose to coefficient employees its preference for the fluctuating workweek method, its docking policy[54] or the possibility that, occasionally, so many hours might be worked that the average hourly rate would dip under the applicable minimum wage. *Cf. Bailey v. County of Georgetown,* 94 F.3d 152, 156 (4th Cir.1996) ("Neither the regulation nor the FLSA in any way indicates that an employee also must understand the manner in which his or her overtime pay is calculated.").

Conn satisfied the clear understanding criterion. First, the written example, which

**53.** Plaintiffs neglect to mention the three occasions when Harrington's salary proved unable to support a regular rate at least equal to the applicable minimum wage. *Compare* Resp. (citing Exhibit G) *with supra* note 40. Those, whether standing alone or considered along with the one minimum wage breach caused by the coefficient employee who worked 90.25 hours in a week, fail to establish that minimum wage violations occur so often that the fluctuating workweek method was unavailable either as to Harrington individually or as to all plaintiffs. *See Aiken,* 977 F.Supp. at 393 (looking to Opinion Letter No. 945 for guidance) (in case involving eleven plaintiffs, defendant's use of the fluctuating workweek method was permissible when only five minimum wage violations occurred over two years). (Any failure by Conn to cure fully these violations would not result in the fluctuating workweek method being unavailable because such errors were few. *See* Opinion Letter No. 945.)

**54.** Although Badon's oral explanation the coefficient employee compensation system made no mention of the docking policy, Conn's written example did.

was provided to each of the plaintiffs, unambiguously showed that a coefficient employee would receive his or her salary regardless of how many hours he or she was assigned to work in a week. The calculations in it portrayed salary as unchanging in the face of varying workweek lengths and as distinct from overtime pay. It also stated, "Do not dock individuals on coefficient *if scheduled short*."[55] These features related that salary, exclusive of overtime, would be provided no matter how many hours of work were scheduled in a week. *See Condo,* 1992 WL 317199, at *3 (clear understanding prevails where employee signed an employment contract that "contained a chart illustrating exactly how plaintiff's overtime pay would vary in relation to the number of hours he worked each week"); *cf. Bailey,* 94 F.3d at 156.

Second, Badon's oral explanation of the coefficient employee pay scheme accorded with the clear understanding criterion. It included a statement that the new coefficient employee would receive his or her salary, regardless of the number of hours he or she was assigned to work in a week.[56] She also secured written statements expressing an understanding of her presentation. *See Condo,* 1992 WL 317199, at *3 ("where an employee has signed and acknowledged an explanatory form indicating how FLSA's fluctuating workweek plan operates, a 'clear mutual understanding of the parties exists' "); *see also Highlander,* 805 F.2d at 647–48 (no clear error in finding that employee, who signed a form acknowledging her understanding of the fluctuating workweek method, possessed a clear comprehension of how she was paid); *cf. Bailey,* 94 F.3d at 156 ("nor do the regulation and the FLSA in any way indicate that an employer must secure from its employees written acknowledgments indicating

that the employees' pay plan has been explained to them"). Badon's explication, along with the written example, enabled Conn to fulfill the clear understanding criterion.[57]

### Limitations and Damages

Conn's motion for summary judgment proves meritorious because it met all of the conditions for using the fluctuating workweek method. This outcome makes its arguments regarding limitations and damages moot. *See Aiken,* 977 F.Supp. at 393 (failing to reach the issue of damages because of the absence of breach of Section 778.114). It also leads to a rejection of plaintiffs' motion for this case to proceed as a FLSA collective action insofar as that request rests on arguments raised in opposition to the summary judgment motion. This latter ruling appears to preserve plaintiffs' motion only as to the question of Conn's admitted exclusion of bonuses and incentives from its regular rate calculations.

### CONCLUSION

The court grants Conn's motion for summary judgment [28] on the issue of the manner in which plaintiffs' overtime compensation was calculated and denies the motion as moot on the issues of limitations and liquidated damages. It also denies plaintiffs' motion for this case to proceed as a FLSA collective action [57] insofar as that request is based on contentions asserted in response to the summary judgment motion. Finally, it defers a decision on plaintiffs' motion as to Conn's admitted omission of bonuses and incentives from regular rate computations.

---

55. "Scheduled short" clearly referred to being assigned fewer than forty hours of work in a week because the written example showed forty hours as a workweek's standard (i.e., non-overtime) duration.

56. Plaintiffs make no claim that difficulty arises because someone other than Badon may have explained the coefficient employee compensation scheme to Cash, Prater, Stroder, Malbrough, Harrington, Johnson, Lucia and Chambers, all of whom were hired after 1989. *See, e.g., Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11, 91

L.Ed.2d at 212–13; *Little,* 37 F.3d at 1075 (en banc); *James,* 854 F.2d at 432 n. 3.

57. Although Neatherly never received an oral explanation from Badon, the absence of any intimation in the summary judgment record that Conn deviated from its longtime practice of paying full salary, exclusive of overtime compensation, regardless of how many hours a coefficient employee was scheduled to work in a week, results in no fact dispute arising as to whether or not the clear understanding criterion was met in his case. *See Monahan,* 95 F.3d at 1275 n. 12.